CARL H. KLEHM *et al.*, d/b/a The Charles Klehm & Son Nursery, Plaintiffs, v. GRECIAN CHALET, LTD., *et al.*, Defendants (Bank of Palatine, Counterplaintiff-Appellant; Pyrgos, Ltd., *et al.*, Counterdefendants-Appellees).

First District (4th Division) No. 86—2755

Opinion filed November 12, 1987.—Rehearing denied January 25, 1988.

James A. McKenna and Marshall J. Schmitt, both of Jenner & Block, of Chicago, for appellant.

George E. Dykes, of Chicago, for appellees.

JUSTICE JOHNSON delivered the opinion of the court:

This appeal arises from a countercomplaint by defendant-counter-plaintiff, Bank of Palatine (hereinafter referred to as the Bank), to foreclose three mortgages securing three commercial loans to defendants-counterdefendants Kostas Konstantopoulos and Peter Aivaliotis (hereinafter also referred to as the debtors), totaling $700,000 in principal. All three loans were secured by real estate located in Arlington Heights, Illinois, housing a restaurant which, at the time the loans were made, was known as the Grecian Chalet. The debtors filed an affirmative defense of unclean hands, alleging that the Bank improperly allocated and disbursed the third loan's proceeds. After a bench trial, the court adopted the debtor's findings of fact and conclusions of law and denied the Bank the right to foreclose as to all three mortgages. The Bank appeals, raising three issues: (1) whether the trial court erred by denying the Bank the

right to foreclose the first mortgage on the basis of the debtors' affirmative defense arising from the disbursement of the third mortgage loan; (2) whether the trial court erred by ruling that the assignment of the second loan was defective and, as a result, denying foreclosure of the second mortgage; and (3) whether the trial court erred by denying the Bank foreclosure on the third mortgage, which secured a loan guaranteed by the Small Business Administration.

We reverse.

The record reveals that the Bank loaned the debtors $170,000 on March 9, 1981, to enable them to purchase a restaurant property from counterdefendant Patrick Puccia. The note and first mortgage, which secured the note, were signed by counterdefendant, the Bank & Trust Company of Arlington Heights as trustee of the land trust in which the debtors and certain family members (counterdefendants Dina Aivaliotis and Vasilios, Voula, and Mary Jane Konstantopoulos) held the beneficial interest.

On the same day, the debtors, through their land trustee, signed a $255,000 note and second mortgage held by Patrick Puccia, the seller of the property at issue. Puccia credited the debtors with $255,000 toward the purchase price of the restaurant property. The second mortgage provided that payments were to be made to the Bank. At the closing of the sale of the restaurant, Puccia signed an assignment prepared by the Bank's attorney transferring the note and mortgage to the Bank as collateral for other obligations he owed the Bank. Puccia later signed another assignment prepared by the Bank's president. Thereafter, Puccia delivered the note and mortgage to the Bank.

The debtors opened the restaurant for business on May 1, 1981. Between June and December 1981, they borrowed an additional $57,000 from the Bank in three short-term loans. These loans were secured by an assignment of the beneficial interest in the land trust that owned the property.

The debtors, by early 1982, had fallen nine months behind in both their first and second mortgage payments, and they were in default on their three short-term loans from the Bank. Contingent upon approval from the Small Business Administration (hereinafter referred to as the SBA), the Bank agreed to loan an additional $275,000. The SBA agreed to guarantee 87%–of the loan and issued a loan authorization on January 8, 1982. Thereafter, the Bank paid out the proceeds in 16 disbursements.

In April 1983, the restaurant was leased to counterdefendant Mark Dalen. Dalen reopened the restaurant under the name of Ba-

carak's and paid rent of $11,000 per month. Pursuant to a written direction signed by the debtors, the Bank acted as collection agent for the rent and applied $8,500 of it to the first and second mortgage obligations.

The SBA granted the debtors an extension of six months on making any payments under the third mortgage loan, at the request of the Bank, expressing the hope that the lease would allow the debtors to retire their entire mortgage indebtedness. The SBA granted a second extension, forestalling principal payments until January 1, 1984, after the Bank pointed out that Dalen had an·option to purchase the property on that date. After seven months, Dalen stopped paying rent and the debtors returned to the restaurant, reopening it as the 62nd Street Tavern and Grill, but made no further mortgage payments.

On November 17, 1982, plaintiffs-counterdefendants Carl H. Klehm, Arnold Klehm and Roy G. Klehm, d/b/a the Charles Klehm & Son Nursery, filed a lawsuit to foreclose a mechanic's lien against the Grecian Chalet restaurant. The Bank filed a three-count countercomplaint to foreclose the three mortgages on May 8, 1984. The debtors raised as an affirmative defense that the Bank disbursed the proceeds of the third mortgage loan in a manner that prevented the debtors ·from repaying their obligations and in a manner that benefitted the Bank. On September 13, 1985, the debtors filed a counterclaim against the Bank alleging that they were damaged by the same conduct.

Debtors have been operating the restaurant since 1983 or early 1984. On March 1, 1986, after the trial of this case had begun, Konstantopoulos purchased a new restaurant and Aivaliotis now operates the mortgaged property by himself.

After a bench trial on the Bank's countercomplaint (the mechanic's lien claim remains pending), the court refused to allow the Bank to foreclose on any of the three mortgages and dismissed the debtors' counterclaim. The Bank appeals.

I

The Bank contends that the trial court improperly denied it the right to foreclose the first mortgage and denies the existence of any inequity in the disbursement of the third loan's proceeds. The Bank continues by arguing that, as a matter of law, the allegedly inequitable conduct relied upon by the debtors as an affirmative defense was independent of and collateral to the first mortgage and, therefore,

cannot serve as a defense to foreclose of that mortgage. In the alternative, it argues that the debtors cannot raise the equitable defense of unclean hands in relation to the allocation and disbursement of the third loan's proceeds because they acquiesced in the distributions. The Bank claims that the first mortgage represents an intelligible economic transaction between two commercial parties and urges this court to focus on the validity of the underlying obligation.

In response, the debtors contend that the applicability of the equitable defense of unclean hands is a matter of fact which rests within the discretion of the trial court. While recognizing that the application of the doctrine of unclean hands is limited, they argue that the loans were connected by the purpose of the SBA guaranteed loan and the Bank's position as the lender on both loans. They argue that their ability to meet their obligations was frustrated by the Bank's conduct. More specifically, the debtors allege that the Bank administered the third loan to benefit its position as mortgagee.

■■ "The law is well settled that an action to foreclose a real estate mortgage is a proceeding in equity and as such, traditional equitable defenses may be raised by a mortgagor." (*First Federal Savings & Loan Association v. Faubion* (1985), 131 Ill. App. 3d 368, 369, 475 N.E.2d 989, 991, citing *Baker v. Loves Park Savings & Loan Association* (1975), 61 Ill. 2d 119, 127, 333 N.E.2d 1, 5.) The debtors point out that the applicability of the doctrine of unclean hands lies within the sound discretion of the trial court (*Block v. Dardanes* (1980), 83 Ill. App. 3d 819, 828, 404 N.E.2d 807, 813-14) and that a court of review may upset this decision only where the manifest weight of the evidence establishes that the trial court abused its discretion (*Jefco Laboratories, Inc. v. Carroo* (1985), 136 Ill. App. 3d 793, 796-97, 483 N.E.2d 999, 1001). This general proposition is unquestioned law. We note, however, a well-settled exception to the equitable defense rule. "That exception is that the equities which may be interposed as a defense to foreclosure *** must arise out of the transaction in which the note and mortgage were given." *McKerchar v. Ayres* (1939), 300 Ill. App. 518, 521, 21 N.E.2d 644, 645; see also *United States v. Thomas* (N.D. Ill. 1985), 627 F. Supp. 129; *First Federal Savings & Loan Association v. Faubion* (1985), 131 Ill. App. 3d 368, 475 N.E.2d 989.

■ The debtors argue that the first and third mortgage loans were part of the same transaction because (1) the Bank of Palatine was the lender in both instances, (2) both loans were secured by mortgages on the same property, and (3) the ultimate purposes of

the loans were to finance the rehabilitation of the restaurant and to make it profitable. Given that the first mortgage was in default prior to the debtors' application for the SBA guaranty, we are not convinced by this argument. Clearly, under the facts presented here, the allegedly inequitable actions of the Bank in relation to the third loan bear no relationship to the debtors' default on the first mortgage loan. The first mortgage loan represents a valid debt, and we cannot countenance the use of the instant allegations of inequity as a means to avoid paying the debt. Moreover, the facts in this case appear to present the precise situation the courts were speaking of when they set the policy of "preventing people from getting other people's property [or money] for nothing when they purport to be buying [or borrowing] it." *First Federal Savings & Loan Association v. Faubion* (1985), 131 Ill. App. 3d 368, 370, 475 N.E.2d 989, 991.

II

The trial court found that the Bank was not entitled to foreclose the second mortgage for three reasons: (1) the assignment of the $255,000 note and second mortgage by Puccia to the Bank was defective; (2) Puccia's obligations to the Bank, for which the second mortgage and note were offered as security, were not in default; and (3) because the Bank disbursed "no fresh money" under the purchase money note. The Bank contends that each of the trial court's reasons for denying foreclosure represents an erroneous ruling as a matter of law. We agree.

■ Considering first the question of whether a valid assignment was effectuated, we are guided by the general tenet that equity looks to the substance and not the form. An assignment, oral or written, occurs when there is a transfer of some identifiable interest from the assignor to the assignee. "[T]he rule has invariably been that no particular form of assignment is required; any document which sufficiently evidences the intent of the assignor to vest ownership of the [subject matter of the assignment] in the assignee is sufficient to effect an assignment in equity." (*Evangelical Slovak Women's Union v. Papanek* (1956), 8 Ill. App. 2d 298, 304, 132 N.E.2d 20, 23; *Hogan v. Dalziel* (1963), 40 Ill. App. 2d 19, 29, 188 N.E.2d 367, 372.) A valid assignment, therefore, needs only to assign or transfer the whole or a part of some particular thing, debt, or chose in action and it must describe the subject matter of the assignment with sufficient particularity to render it capable of identification. *Pa-*

*panek*, 8 Ill. App. 2d at 304-05, 132 N.E.2d at 23; *Hogan*, 40 Ill. App. 2d at 29, 188 N.E.2d at 372.

The intent of the parties to an assignment is a question of fact to be derived not only from the instrument executed by the parties, but also from the surrounding circumstances. (*Rivan Die Mold Corp. v. Stewart Warner Corp.* (1975), 26 Ill. App. 3d 637, 642, 325 N.E.2d 357, 361.) The intent of Patrick Puccia and the Bank, the parties to the assignment, appears clear from the instrument, the transaction in which the assignment occurred, the designation of the Bank as recipient of the payment on the note and second mortgage, and the testimony of the parties to the assignment. However, the intent criteria of the assignment is not at issue here. Instead, the debtors argue that the assignment was defective because it failed to adequately describe the subject matter of the assignment. They contend that the omission of the word "deed" from the term "trust deed" in the written instrument only affords identification of the note to Puccia and, therefore, does not transfer the second mortgage to the Bank.

The assignment dated March 10, 1981, provides as follows:

"For value received I hereby assign all my rights, title and interest in and to:

That certain note and trust dated 3-9-81 from the Bank & Trust Company of Arlington Heights, Trustee under trust no. 2635 dated 11-15-80 in the amount of $255,000 payable to Patrick Puccia

[illegible] the Bank of Palatine."

We find that the subject matters of the assignment (the note and trust deed) are described with sufficient particularity for us to identify them and to render the assignment effective.

We turn now to the question of whether the Bank, as assignee, may foreclose the second mortgage where the debt of the assignor, which the assignment secured, was not in default and where the assignee issued "no fresh money" under the subject matter of the assignment. The debtors present no argument in their brief on these issues.

The law is clear that when a valid assignment has been effected, the assignee acquires all of the interests in the transferred property previously held by the assignor. (See *People v. Wurster* (1981), 97 Ill. App. 3d 104, 422 N.E.2d 650.) Thus, the assignee stands in the shoes of the assignor and, in so doing, is subject to any defense that might be urged against the assignor.

Considering the facts before us, we find that the debtors, as

mortgagors, are in default on the note and second mortgage to Puccia. They present no defense against the right of Puccia to foreclose that mortgage. Therefore, Puccia, as mortgagee, has a right to foreclose. However, Puccia assigned that right to the Bank as collateral on an obligation he owed the Bank. As a result of the assignment, the Bank, as assignee, has the right to foreclose the second mortgage regardless of the status of Puccia's obligation to it.

The argument that this right is defeated by the fact that the Bank issued no money under the note secured by the second mortgage is meritless. Notes and mortgages are freely transferable instruments. (Ill. Rev. Stat. 1961, ch. 26, pars. 3—103, 3—106.) The debtors, clearly, have defaulted and are obligated to repay the full $255,000 to the holder of the note, no matter who disbursed the loaned money. The Bank holds the note and second mortgage pursuant to a valid assignment and, therefore, may rightfully foreclose the mortgage.

### III

The Bank's third contention is that the trial court erred in denying it the right to foreclose the third mortgage. In so ruling, the trial court held that (1) the Bank lacked standing because of a defect in its pleadings, (2) the SBA is a necessary party that was not properly joined, (3) the Bank breached the SBA loan authorization, and (4) the Bank engaged in inequitable conduct and bad faith in managing the third loan.

The debtors argue that the Bank was unable to establish its standing to foreclose the SBA guaranteed loan's mortgage because its pleadings failed to comply with section 2—403 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—403). This section provides, in pertinent part, that an assignee or owner of a nonnegotiable chose in action shall allege under oath, in his or her pleadings, "that he or she is the actual bona fide owner thereof, and set forth how and when he or she acquired title." (Ill. Rev. Stat. 1985, ch. 110, par. 2—403.) The debtors assert that the note at issue here is a nonnegotiable instrument because it is not for a sum certain but has a variable rate of interest. They rely on section 3—104 of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 3—104(b)), which requires a writing to "contain an unconditional promise or order to pay a sum certain in money" to be a negotiable instrument. Section 3—106(b) specifies that a sum payable is a sum certain even though it is to be paid "with stated different rates of

interest before and after default or a specified date." Ill. Rev. Stat. 1981, ch. 26, par. 3—106(b).

The note in issue provides:

> "The interest rate as of the date hereof is 18.75 percent per annum. The 'interest rate spread' shall be 2.75 percent per annum. The first day of each January, April, July and October of each calendar year shall constitute a 'change date.' 'Prime rate' shall be the minimum prime lending rate at either New York or large money center banks as published in The Wall Street Journal.
>
> On each successive change date, commencing with the change date occurring not less than three (3) months following first disbursement of the loan evidenced by this note, the interest rate herein shall increase or decrease to a percentage per annum equal to the sum of the interest rate spread and the prime rate in effect on such change date. If The Wall Street Journal is not published on such change date, the prime rate in effect on such change date shall be deemed to be that rate published on the first publication date of The Wall Street Journal immediately following such change date."

Clearly, the note states a rate of interest which varies on specified days and comports with the definition of a sum certain as found in section 3—106(b). Therefore, the debtors fail to bring themselves within the parameters of the rule they assert. Accordingly, we find that the note is a negotiable instrument and section 2—403 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—403) is not applicable.

The debtors argue next that the SBA is a necessary party to this action and has not been properly joined. They point out that, according to the Federal regulations governing the SBA (Title 13), the real estate in question secures the interests of both the Bank and the SBA, making the SBA an interested and necessary party. They assert that a court order satisfying the claims of the Bank, without jurisdiction over the SBA, would subject them to a second action brought by the SBA to protect its security interest. They continue by alleging that the July 24, 1984, default order entered against the SBA is ineffective because the SBA had not consented to being sued.

We agree that the SBA has a protectable interest in this action and is, therefore, a necessary party. However, we find the debtors' allegation as to the ineffectiveness of the default order is erroneous. The documentary evidence provided in the record clearly

establishes that the SBA consented to this suit, that the SBA was named as a party in this action, and that the default order is valid.

In ruling that the Bank should not be allowed to foreclose the third mortgage, the trial court specifically found that the SBA authorization is a contract which the plaintiff lender, the Bank, must strictly follow. The court accepted the debtors' argument that the Bank had breached the SBA authorization and, therefore, should not be allowed to maintain an action based on the debtors' alleged breach. The debtors argue that the Bank disbursed the third loan's proceeds to benefit its position as mortgagee and not in accordance with the SBA's authorization.

■■ The Bank directs us to compare the expressions of the purpose of the loan authorization in sections 122.19 and 122.10(a)(6) of the SBA's regulations. The first of these regulations provides, in pertinent part, as follows:

> "If SBA approves a loan application, a formal loan authorization is issued by SBA. *This authorization is not a contract to lend or a loan agreement.* Instead, it states the conditions which the borrower must meet before financial assistance will be extended. When the borrower is prepared to meet these conditions, SBA or the financial institution will arrange a date, time and place for closing the loan." (Emphasis added.) (13 C.F.R. § 122.19 (1982).)

Section 122.10(a)(6) provides:

> "SBA shall be released from obligation to purchase its share of the guaranteed loan, unless the financial institution has *substantially complied* with all of the provisions of these regulations and the Guaranty Agreement. \*\*\*." (Emphasis added.) (13 C.F.R. § 122.10(a)(6) (1982).)

A comparison of these expressions makes clear that the loan authorization is not a contract to lend, but an agreement between the SBA and the financial institution lending the money, here the Bank, defining under what conditions the SBA would honor its guarantee. This agreement amounts to a unilateral contract which takes effect upon the happening of a specified occurrence, the default by the debtors on their obligation. Under the agreement the SBA would be obligated to perform by honoring its guarantee only if the Bank performed by substantially complying with the conditions of the agreement. The SBA honored its guarantee after investigating the Bank's management of the proceeds and, thereby, determined that the Bank had satisfactorily performed. We find that the SBA's determination as to whether the Bank's actions comport to its guidelines is dispositive of the issue.

Therefore, the debtors' contention fails.

 Similarly, the debtors' final contention that the Bank engaged in inequitable conduct and bad faith in the management of the third loan's proceeds is without merit. Their argument is based on allegations that the Bank deviated from the guidelines of the SBA loan authorization to disburse the proceeds in a manner beneficial to its own interest as mortgagee. As discussed above, the SBA determined that the Bank complied with the authorization as evidenced by the SBA's honoring its guaranty. We find it incongruous that the Bank could have both managed the loan in an inequitable manner and comported with the SBA authorization. Having already found that the Bank did not substantially deviate' from the guidelines expressed by the SBA, we find that the Bank has the right to foreclose the third mortgage.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Reversed.

McMORROW, P.J., and LINN, J., concur.