**Emil J. AMBERBOY, et al., Appellants,**

v.

**SOCIETE de BANQUE PRIVEE,
et al., Appellees.**

No. D-0986.

Supreme Court of Texas.

April 15, 1992.

Edward K. White, III, J. Leon Lebowitz, The Woodlands, E. John Gorman, Houston, for appellants.

J. Eugene Clements, Stephen B. Schulte, Jerry L. Mitchell, Jr., Houston, for appellees.

1. All references to the Texas Uniform Commercial Code or the Code will be to the Uniform Commercial Code as enacted by the Texas Legislature and codified in the Texas Business and Commerce Code. TEX.BUS. & COM.CODE §§ 1.101–11.018.

## OPINION

CORNYN, Justice.

This case comes to us on a certified question from the United States Court of Appeals for the Fifth Circuit. The question is whether a promissory note requiring interest to be charged at a rate that can be determined only by reference to a bank's published prime rate is a negotiable instrument as defined by the Texas Uniform Commercial Code. *Ackerman v. Federal Deposit Ins. Corp.*, 930 F.2d 3, 4 (5th Cir. 1991), *certified question accepted sub nom., Amberboy v. Societe de Banque Privee*, 34 Tex.Sup.Ct.J. 690 (June 22, 1991). For the reasons set forth below, we answer the question in the affirmative.

In Texas, negotiable instruments are governed by the Uniform Commercial Code ("U.C.C.") as adopted by the Texas Legislature and codified in the Texas Business and Commerce Code.[1] Specifically, section 3.104 contains the requirements of a negotiable instrument. That section provides:

(a) Any writing to be a negotiable instrument within this chapter must

(1) be signed by the maker or drawer; and

(2) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this chapter; and

(3) be payable on demand or at a definite time; and

(4) be payable to order or to bearer.

TEX.BUS. & COM.CODE § 3.104. The Code does not define the term "sum certain." However, section 3.106 lists several instances when the sum certain requirement is not defeated even though the amount payable is not explicitly stated on the instrument.[2]

2. Section 3.106 of the Code provides:

(a) The sum payable is a sum certain even though it is to be paid

(1) with stated interest or by stated installments; or

This is not just an ordinary case of statutory construction. Our construction of the provisions of the U.C.C. is grounded in the Code's fundamental purpose, which is to "simplify, clarify and modernize the law governing commercial transactions...." TEX.BUS. & COM.CODE § 1.102(b)(1). Further, the drafters of the U.C.C. expressly contemplated that the courts would advance the basic purpose of the Code by construing the U.C.C.'s provisions "in the light of unforeseen and new circumstances and practices." TEX.BUS. & COM.CODE ANN. § 1.102, comment 1 (Vernon 1968); *see also* Gary B. Tillman, *Variable Interest Rates, Negotiability, and the Sum Certain Requirement*, 22 U.C.C. L.J. 36, 60 (1989). This "permit[s] the continued expansion of commercial practices through custom, usage and agreement of the parties...." TEX.BUS. & COM.CODE § 1.102(b)(2).

It is our task to construe the U.C.C.'s "four corners" rule for determining whether the sum certain requirement is met. For an instrument to be negotiable under that rule, the sum certain to be paid must be capable of computation "from the instrument itself without reference to any outside source...." TEX.BUS. & COM.CODE ANN. § 3.106, comment 1 (Vernon 1968). However, the Code itself evidences that this is not intended to be a rigid, absolute rule. Section 3.106 lists several instances in which reference to sources outside the instrument are necessary to determine the sum payable under the instrument. *See, e.g.,* § 3.106(a)(4) (payment in exchange at current rate).

Section 3.106 does not explicitly mention variable rate notes ("VRNs") because when the U.C.C. was developed in the 1950s and adopted in the 1960s, VRNs were virtually unknown. Fred H. Miller, *1990 Articles 3 and 4: Looking to the Twenty–First Century*, UCC BULL., June 1991, at 1; Tillman, 22 U.C.C. L.J. at 61–62; *see also*

Janine S. Hiller, *Negotiability and Variable Interest Rates*, 90 COM.L.J. 277, 277–78 (1985). The necessity for VRNs came about as a result of the volatile financial markets of the late 1970s. By the mid-1980s, VRNs accounted for 60% of the total loans made in this country. *Hiller*, 90 COM.L.J. at 277. That dominance in the financial markets has continued into the 90s. Federal Reserve, Statistical Release, Survey of Terms of Bank Lending Made During November 5–9, 1990 (Dec. 14, 1990).

The majority of courts which have addressed the issue before us have declined to hold that notes which contain variable interest rates are negotiable instruments. *Chemical Bank v. D3J Assocs. Ltd. Partnership*, 14 U.C.C.Rep.Serv.2d (Callaghan) 790, 794, 1991 WL 58049 (D.Md.1991) (rate stated as 1% above floating prime or its equivalent charged by specified bank); *In re Gas Reclamation, Inc. Securities Litigation*, 741 F.Supp. 1094, 1102–03 (S.D.N.Y.1990) (rate stated as lesser of a fixed rate over the prime rate charged by a specified bank or the maximum lawful allowed), *appeal dism'd sub nom. Abish v. Northwestern Nat'l Ins. Co.*, 924 F.2d 448 (2d Cir.1991); *National Union Fire Ins. Co. v. Alexander*, 728 F.Supp. 192, 199–200 (S.D.N.Y.1989) (rate stated as 2% above prime rate charged by Cullen Frost Bank, adjusted daily); *Northern Trust Co. v. E.T. Clancy Export Corp.*, 612 F.Supp. 712, 715 (N.D.Ill.1985) (rate stated as ½% above the bank's floating prime rate); *Centerre Bank v. Campbell*, 744 S.W.2d 490, 498 (Mo.App.1988) (interest may vary with bank rates charged to the lender); *Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191, 195 (1987) (rate stated as 3% over Chase Manhattan prime adjusted monthly); *Farmers Prod. Credit Ass'n v. Arena*, 145 Vt. 20, 481 A.2d 1064, 1065 (1984) (provided for a variable rate of interest); *A. Alport & Son,*

---

(2) with stated different rates of interest before and after default or a specified date; or

(3) with a stated discount or addition if paid before or after the date fixed for payment; or

(4) with exchange or less exchange, whether at a fixed rate or at the current rate; or

(5) with costs of collection or an attorney's fee or both upon default.

(b) Nothing in this section shall validate any term which is otherwise illegal.

TEX.BUS. & COM.CODE § 3.106.

*Inc. v. Hotel Evans, Inc.*, 65 Misc.2d 374, 317 N.Y.S.2d 937, 939–40 (1970) (provided for interest at bank rates). A number of states, either in response to court decisions which reject VRNs as negotiable instruments or for reasons that are not readily apparent, have amended section 3.106 to provide that the sum certain requirement is not defeated because the rate of interest to be charged is tied to and varies with certain enumerated types of published rates.[3] A similar amendment to the Texas Uniform Commercial Code was contained in House Bill 2497, which passed the House but was not voted upon in the Senate.[4]

We believe the better reasoned view is reflected in the opinions of those courts which have held that VRNs do meet the sum certain requirement and thus are negotiable instruments subject to the terms of article 3 of the U.C.C. *Goss v. Trinity Sav. & Loan Ass'n*, 813 P.2d 492, 499 (Okla.1991) (interest rate tied to T-bill index); *Tanenbaum v. Agri–Capital, Inc.*, 885 F.2d 464, 468–69 (8th Cir.1989) (applying the Texas Uniform Commercial Code); *First City Fed. Sav. Bank v. Bhogaonker*, 715 F.Supp. 1216, 1219–20 (S.D.N.Y.1989); *Klehm v. Grecian Chalet, Ltd.*, 164 Ill. App.3d 610, 115 Ill.Dec. 662, 667, 518 N.E.2d 187, 192 (1987). Notably, four of the six states whose courts have held VRNs to be non-negotiable under versions of the U.C.C. similar to ours, all but Illinois[5] and Vermont, have amended their versions of the U.C.C. to render VRNs negotiable.[6] Paradoxically, the concurrent

---

**3.** Arizona (ARIZ.REV.STAT.ANN. § 47–3106(B) (Supp.1991))
California (CAL.COM.CODE § 3106(2) (West Supp.1992))
Delaware (DEL.CODE ANN., tit. 6, § 3–106(1)(f) (Supp.1990))
Florida (FL.STAT.ANN. § 673.106(2) (West Supp.1991))
Indiana (IND.CODE ANN. § 26–1–3–106(1) (Michie Supp.1991))
Iowa (IOWA CODE ANN. § 554.3106(1)(f) (West Supp.1991))
Kentucky (KY.REV.STAT.ANN. § 355.3–106(2) (Michie/Bobbs–Merrill Supp.1991))
Louisiana (LA.REV.STAT.ANN. § 10:3–106(1)(a) (West Supp.1990))
Maryland (MD.COM.LAW CODE ANN. § 3–106(2) (Michie Supp.1991))
Mississippi (MISS.CODE ANN. § 75–3–106(2) (Supp.1991))
Missouri (MO.ANN.STAT. § 400.3–106(2) (Vernon Supp.1992))
Nevada (NEV.REV.STAT.ANN. § 104.3106(2) (Michie Supp.1991))
New York (N.Y.U.C.C.LAW § 3–106(2) (West Supp.1991))
North Dakota (N.D.CENT.CODE § 41–03–06(1)(f) (Michie Supp.1991))
Oregon (OR.REV.STAT. § 73.1060 (1989))
Tennessee (TENN.CODE ANN. §§ 47–3–104(1)(b) & 47–3–106(1)(f) (Michie Supp. 1991))
Virginia (VA.CODE ANN. § 8.3–106(2) (Michie Supp.1991))
Washington (WASH.REV.CODE ANN. § 62A.3–106(2) (West Supp.1991))
West Virginia (W.VA.CODE § 46–3–106(1) (Michie Supp.1991))
Reference to the legislative histories for these amendments indicate that their purpose was to eliminate confusion on this issue and codify existing commercial practice. *See, e.g., First City Fed. Sav. Bank v. Bhogaonker*, 715 F.Supp. 1216, 1219–20 (S.D.N.Y.1989). The bill amend-

ing section 3–106 in New York was intended "to recognize already existing commercial practices and its purpose was 'to clarify any confusion surrounding the use of variable interest rates.'" (citing the New York State Assembly Memorandum in Support of Legislation). *Id.*

**4.** H.B. 2497 was proposed during the regular session of the 72nd Legislature. The Bill Analysis accompanying H.B. 2497 states that "H.B. 2497 is intended to *clarify* any confusion which may exist in this State concerning whether the common practice of using variable interest rates in promissory notes renders such notes nonnegotiable" (emphasis added). The Bill was passed by the House of Representatives on May 20, 1991 and subsequently reported to the Senate. Although the Senate Committee on Economic Development reported the bill favorably, the bill was not presented for a vote by the Senate before adjournment *sine die*.

**5.** A federal district court sitting in Illinois has held VRNs to be non-negotiable, and a state court of appeals has held them to be negotiable, both while interpreting the Illinois Uniform Commercial Code. *Compare Northern Trust Co. v. E.T. Clancy Export Corp.*, 612 F.Supp. 712, 715 (N.D.Ill.1985) *with Klehm v. Grecian Chalet, Ltd.*, 164 Ill.App.3d 610, 115 Ill.Dec. 662, 667, 518 N.E.2d 187, 192 (1987).

**6.** The four states that have amended their versions of the U.C.C. are Maryland, Missouri, New York and Virginia. *See supra* at note 3. Of those, three states amended their versions of the U.C.C. after a state court ruled that VRNs were not negotiable under then existing law. *See Centerre Bank v. Campbell*, 744 S.W.2d 490, 498 (Mo.App.1988); *Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191, 195 (1987); *A. Alport & Son, Inc. v. Hotel Evans, Inc.*, 65 Misc.2d 374, 317

enactment of statutory amendments designed to "clarify existing law" and conflicting court decisions expounding on "existing law" prompted the National Conference of Commissioners on Uniform State Law to propose, in the interest of uniformity, its own amendments to article 3 of the Uniform Commercial Code to specifically provide that VRNs are negotiable instruments.[7]

A VRN which contains provision for interest to be paid at a variable rate that is readily ascertainable by reference to a bank's published prime rate is compatible with the Code's objective of commercial certainty. The Code does not require "mathematical certainty" but only "commercial certainty." *Tanenbaum*, 885 F.2d at 468 (applying Tex.Bus. & Com.Code § 3.104 and citing *Cudahy Packing Co. v. State Nat'l Bank*, 134 F. 538, 542 (8th Cir.1904)). Commercial certainty serves the purpose of the law of negotiable instruments, which is to make the instrument the functional equivalent of money. *Hiller*, 90 COM.L.J. at 279; *see also Cobb Bank & Trust Co. v. American Mfg. Mut. Ins. Co.*,

459 F.Supp. 328, 333 (N.D.Ga.1978). If the rate of interest to be paid under the instrument is readily ascertainable by reference to a bank's published prime rate, this purpose is achieved.

We believe that the construction more consistent with the stated purpose of the U.C.C. and modern commercial practices obliges us to answer the Fifth Circuit's certified question affirmatively. Widespread use and acceptance of VRNs in the 1980s is precisely the type of new circumstance contemplated by the drafters of section 1.102, comment 1.

Appellants' reliance on our decision in *Brazos River Authority v. Carr* is misplaced. 405 S.W.2d 689 (Tex.1966). Although the bonds in *Brazos River* contained a variable rate, we held they were not negotiable because they did not contain an unconditional promise to pay; payment was required only if funds were available in a specified account at the time payment was due. *Id.* at 696. For this reason, *Brazos River Authority* does not control this case.

---

N.Y.S.2d 937, 939–40 (1970). One court found VRNs to be non-negotiable under the prior version of the U.C.C. enacted by the state of Maryland after the statute had been amended to specifically provide that VRNs are negotiable. *See Chemical Bank v. D3J Assocs. Ltd. Partnership*, 14 U.C.C.Rep.Serv.2d (Callaghan) 790, 794, 1991 WL 58049 (D.Md.1991).

7. Specifically, sub-section (a) of section 3–104 of the Uniform Commercial Code has been revised as follows:

(a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
(2) is payable on demand or at a definite time; and
(3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the

benefit of any law intended for the advantage or protection of an obligor.
Revised U.C.C. § 3–104(a), 2 U.L.A. 25 (1991). Section 3–112 of the UCC was then revised to define interest to specifically include VRNs. Sub-section (b) of section 3–112 provides:
(b) Interest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument. If an instrument provides for interest, but the amount of interest payable cannot be ascertained from the description, interest is payable at the judgment rate in effect at the place of payment of the instrument and at the time interest first accrues.
Revised U.C.C. § 3–112(b), 2 U.L.A. 39 (1991). Under this revision, the term "sum certain" contained in section 3–104(a) as originally drafted is replaced with the term "fixed amount." The requirement of a fixed amount applies only to principal. Revised U.C.C. § 3–112, 2 U.L.A. 39, comment 1 (1991). If the amount of interest to be paid cannot be ascertained from the description of interest contained in the instrument, interest is payable at the judgment rate. Thus, under the revisions, interest will always be determinable. *Id.*

In support for the conclusion that "[u]se of an interest rate that cannot be calculated from information on the face of the note has consistently been held to violate the Texas statute's 'sum certain' requirement," at 801, the concurring and dissenting justices cite four cases. Two were decided by federal district courts citing no Texas state court authority.[8] To the extent that federal courts have ventured an "Erie-guess" as to the applicable Texas law, and guessed differently from our answer to the present certified question, *see American Waste & Pollution Control Co. v. Browning-Ferris, Inc.,* 949 F.2d 1384, 1386 (5th Cir.1991) (cases cited), we do not feel constrained to address those opinions except to respectfully say that we have decided this issue of unsettled Texas law differently from the way they have predicted. Finally, the two state court of appeals opinions relied upon by the concurring and dissenting justices are addressed, and disapproved, in the analysis that follows.

We note that the only two Texas state cases relied upon by the concurring and dissenting justices were both decided by the same court of appeals: *Lexington Ins. Co. v. Gray,* 775 S.W.2d 679 (Tex.App.—Austin 1989, writ denied) and *Dillard v. NCNB Texas Nat'l Bank,* 815 S.W.2d 356 (Tex.App.—Austin 1991, no writ). In *Lexington* the notes provided for a variable rate of interest tied to a "fluctuating 'base rate' established by the [b]ank." 775 S.W.2d at 682. The court of appeals, citing only TEX.BUS. & COM.CODE § 3.104(a), concluded that "the note apparently is not a negotiable instrument...." *Id.* This incidental holding was not determinative of the issue presented: assignability of certain guaranty agreements. Furthermore, no point of error challenging this holding of the court of appeals was brought forward to this court for review so we had no opportunity to pass on the correctness of the court of appeal's decision.

In *Dillard v. NCNB Texas Nat'l Bank,* the note in question specified interest was to be paid at the lender's prime rate plus two percent. 815 S.W.2d at 360. Summary judgment was granted in favor of the bank to which the note had been assigned and against the note's guarantors. The note contained a written endorsement to the Federal Reserve Bank–Dallas placed on the document while in the possession of First RepublicBank. When First Republic-Bank failed, its assets, including this note, were transferred to NCNB Texas National Bank ("NCNB") by the Federal Deposit Insurance Corporation. The issue on appeal was whether NCNB had established itself as the holder of the note as a matter of law. The court of appeals held that the note was non-negotiable and thus not subject to transfer by simple endorsement, citing *Brazos River Authority* and *Lexington. Id.* Nevertheless, the court noted that non-negotiable instruments are assignable and that the endorsement was sufficient to raise a fact issue on whether the note had been properly assigned to the Federal Reserve Bank. *Id.* Because the court concluded there was a disputed fact issue as to NCNB's status as holder of the note, it reversed the judgment in favor of NCNB and remanded the case to the trial court. *Id.* at 360–61. Although we consider that the issue whether VRNs are negotiable instruments is not controlled by either *Dillard* or *Lexington* in the interest of clarity we disapprove of the holdings in *Dillard* and *Lexington* to the extent they may be construed to conflict with our holding today.

Therefore, in response to the question certified to us by the United States Court of Appeals for the Fifth Circuit we reply that a promissory note requiring interest to be charged at a rate that can be determined only by reference to a bank's published prime rate is a negotiable instrument as defined by the Texas Uniform Commercial Code. By a "bank's published prime rate," we intend our answer to include only those rates which are public, either known to or

---

8. *In re Gas Reclamation, Inc. Securities Litigation,* 741 F.Supp. 1094 (S.D.N.Y.1990) (citing only other federal district court cases for the relevant proposition) and *National Union Fire Ins. Co. v. Alexander,* 728 F.Supp. 192 (S.D.N.Y. 1989) (citing no Texas cases for the relevant proposition).

readily ascertainable by any interested person. *See* BLACK'S LAW DICTIONARY 1233 (6th ed. 1990). We do not, however, specify or limit the manner in which the rate must be published. The requirement of commercial certainty is satisfied when the information is readily available to the public, regardless of the means utilized to make that information available.

Having answered the certified question posed, we do not proceed to apply our answer to the facts of the case now pending before the Fifth Circuit Court of Appeals, as the concurring and dissenting justices claim to do.[9] This is for two, it appears to us, obvious reasons. First, we do not have jurisdiction to decide the whole case. It would exceed this court's constitutional and rule-based authority to apply our answer to the factual record before the Fifth Circuit. *See* TEX.CONST. art. V, § 3–c; TEX.R.APP.P. 114. Second, a certified question is a limited procedural device that constrains us to answer only the question certified "and nothing more." *Moreno*

*v. Sterling Drug, Inc.*, 787 S.W.2d 348, 349 (Tex.1990). For these reasons, we confine our answer to the question propounded by the certifying court. How our answer is to be applied in the case before the Fifth Circuit Court of Appeals is solely the province of the certifying court.[10]

Concurring and dissenting opinion by DOGGETT, J., joined by MAUZY, HIGHTOWER and GAMMAGE, JJ.

DOGGETT, Justice, concurring and dissenting.

I concur in the court's acceptance of this certified question but disagree with its answer. This writing seeks to clarify the proper function of the Texas .Supreme Court in responding to such queries and to explain why the answer provided in this particular case is erroneous.

## I.

In our federal system, proper deference should be given to our state courts in the

**9.** Of course our rules limit consideration of a certified question from a federal appellate court to those for which "it appears that there is no controlling precedent in the decisions of the Texas Supreme Court." TEX.R.APP.P. 114(a). Our only purpose in answering the question then is to obviate the need for the Fifth Circuit Court of Appeals to venture into "the always-dangerous undertaking of predicting what Texas courts would hold if the issue were squarely presented to them." *Stephens v. State Farm Mut. Auto. Ins. Co.*, 508 F.2d 1363, 1366 (5th Cir.1975). By answering certified questions for those federal appellate courts that are Erie-bound to apply Texas law, we avoid the potential that the federal courts will guess wrongly on unsettled issues, thus contributing to, rather than ameliorating confusion about the state of Texas law. We find such cooperative effort to be in the best interests of an orderly development of our own unique jurisprudence, and to the bar, as well as in the best interests of the litigants we concurrently serve.

**10.** We do not agree with all of the concurring and dissenting justices' observations about the certification process, and we emphatically reject any criticism, express or implied, of the United States Court of Appeals for the Fifth Circuit. We do not presume to instruct the Fifth Circuit, or any other federal court, on how they conduct their business. We specifically reject that opinion's attribution of language to the Fifth Circuit which that court disavows.

As for the reasons why this court has conducted itself as it has in addressing certified questions, obviously, the concurring and dissenting justices' opinion does not speak for all the justices of this Court. Caution should be observed in characterizing the actions of a collegial body on such discretionary matters. As Chief Judge Cardozo once observed, "The springs of conduct are subtle and varied." *De Cicco v. Schweizer*, 221 N.Y. 431, 438, 117 N.E. 807, 810 (1917).

Texas is a comparative newcomer to the interjurisdictional certification process, which originated with an act of the Florida Legislature in 1945, FLA.STAT. § 25.031, and has now been adopted in some form in at least 40 states. Chief Justice Thomas R. Phillips, Certification of Questions of Law by Federal to State Courts, Presented to the Judicial Conference of the United States, Federal–State Jurisdiction Committee 1 (Jan. 16, 1992) (Manuscript on file with the Supreme Court of Texas). Texas has utilized the procedure only since the adoption of TEX. CONST. art. V, § 3–c, effective January 1, 1986. The Fifth Circuit, on the other hand, has had more extensive experience with certification than any other court, state or federal. *See* 17A C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE & PROCEDURE § 4248 at 176 (1988). Many of the practices and procedures relating to certification now in common use were first developed by that court. We acknowledge the Fifth Circuit's experience in this area and welcome constructive suggestions on how the interjurisdictional certification process can be improved.

interpretation of the unique law of each state. To further this objective the people of Texas approved a constitutional amendment specifically empowering this court to "answer questions of state law certified from a federal appellate court." Tex. Const. art. V, § 3–c. We in turn adopted a procedure to "answer questions of law of this state which may be determinative of the cause then pending [in the certifying court when] there is no controlling precedent in the decisions of the Supreme Court of Texas" or alternatively to "decline to answer [such] questions." Tex.R.App.P. 114(a). During the five years since adoption of this procedure, we have received eight certifications, of which five were accepted[1] and three were declined.[2]

To some extent, each time a question is certified to a state court, the federal court is fulfilling its obligation under our federal system to respect a state's laws. Federal courts throughout the country should also recognize the strong desire of this court to fulfill the responsibilities and opportunities afforded to us by that federalism. Each state has its own distinctive history, and that of Texas is certainly unique among all others in this union. We, like other states,[3] have emphasized the "independent vitality" of our Texas Constitution and "our power and duty to protect the additional state guaranteed rights [it affords] all Texans." *LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (Tex.1986). We encourage federal courts to inquire concerning the resolution of doubtful questions of state law which are critical to the outcome of pending litigation. Certainly we have a strong preference for

this approach rather than the alternative— an incorrect federal surmise regarding how we would resolve a matter of disputed Texas law. Such federal errors would only serve to make our work more difficult by leading to misreliance on federal precedents by both the bench and bar.

In addressing properly presented queries regarding state law, we should not, however, be viewed as a mere adjunct of the federal judiciary. Such a misconception of our role[4] apparently formed the basis for the recent comments that:

> while certification is a useful means of giving the state's highest courts an opportunity to decide cases of first impression involving state law, the Texas Supreme Court has evinced a mysterious reluctance to accept questions of first impression that we have recently submitted to it for decision. *E.g., Hotvedt v. Schlumberger Ltd.* (N.V.), 925 F.2d 119 (5th Cir.1991) (certification subsequently rejected); *Exxon Co., U.S.A. v. Banque de Paris et des Pays–Bas*, 889 F.2d 674, 676 (5th Cir.1989), *cert. denied*, 496 U.S. 943 [110 S.Ct. 3230, 110 L.Ed.2d 676] (1990).... Additionally, the amount of time taken by that court in deciding to reject a certification has been, at times, frustratingly long. *E.g., Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank*, 912 F.2d 756 (5th Cir.1990) (eleven months).

*Jackson v. Freightliner Corp.*, No. 90–7092, slip op. 5171, 5174–75 (5th Cir. Aug. 7, 1991), *published as modified*, 938 F.2d

---

**1.** In addition to the present case, this court has answered the questions certified by the Fifth Circuit in *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348 (Tex.1990); *Humana Hosp. Corp. v. American Medical Sys., Inc.*, 785 S.W.2d 144 (Tex.1990); *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988). Oral argument has recently been heard in *Boyert v. Tauber*, D–1885 (certified by the Fourth Circuit).

**2.** *Hotvedt v. Schlumberger Ltd.*, 34 Tex.Sup.Ct.J. 610 (June 5, 1991); *Reliance Ins. Co. v. Capital Bancshares, Inc.*, 33 Tex.Sup.Ct.J. 615 (June 27, 1990); *Exxon Co. U.S.A. v. Banque de Paris et des Pays–Bas*, 32 Tex.Sup.Ct.J. 623, 1989 WL 240212 (Sept. 20, 1989).

**3.** *See, e.g., Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 894 & 903 (1991); *State v. Ball*, 124 N.H. 226, 471 A.2d 347, 350 (1983); *People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 329–30, 531 P.2d 1099, 1113–14 (1975).

**4.** This misconception is no doubt reinforced by the subservient philosophy sometimes espoused by members of our own court. *See* p. 798, n. 10; *see also Bexar Cty. Sheriff's Civ. Serv. v. Davis*, 802 S.W.2d 659, 669 (Tex.1990) (Doggett, J., dissenting) ("[S]tate courts share an important responsibility in assisting the federal judiciary to shape the fundamental constitutional fabric of our country.... I prefer a little more Texas thinking ... in Washington instead of waiting for Washington to think for Texas.")

40 (5th Cir.1991). Whether this criticism reflects the true sentiments of some members of the Fifth Circuit [5] or only a clerical mishap,[6] our commitment to addressing certified questions expeditiously but independently should be reaffirmed.

Although this court has never expressed "reluctance" to answer certified questions, there have been appropriate reasons for declining some requests. Response to a certified question is inappropriate when the factual record is not adequately developed. *See Exxon Co., supra.*[7] Further, when the federal court has already properly resolved the legal issue, a writing by this court may be unnecessary. For example, see *Hotvedt v. Schlumberger Ltd.*, 925 F.2d 119 (5th Cir.1991),[8] and *Reliance Insurance Co. v. Capital Bancshares, Inc.*, 912 F.2d 756 (5th Cir.1990).[9] Additionally, we must make an independent determination for each certification that the matter involved is of general importance to the jurisprudence of the state.[10]

Whatever our response, it should be provided expeditiously. Contrary to the observation in *Jackson*, we have generally accomplished this objective. With one exception,[11] this court has taken an average of about three months to decide whether or not to answer the questions certified. While this represents a response time far superior to much decisionmaking in the federal courts, it nevertheless can and should be improved. If the question involved is particularly time sensitive or deserving of immediate attention, the federal court should "request, together with supporting reasons, that expeditious treatment be accorded to a particular case."[12] The process may be delayed if, as has sometimes occurred, requests are submitted dur-

5. *See also Exxon Co., U.S.A. v. Banque de Paris et des Pays–Bas*, 889 F.2d 674, 676 (5th Cir. 1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990), (referring to the "Delphic refusal" of the Texas Supreme Court to answer a certified question).

6. According to the opinion's author, "[n]o such opinion ever issued from the 5th Circuit Court of Appeals.... West Publishing Company erroneously issued it." Janet Elliott, *Inter–Court Friction Bubbles Briefly to Surface: Message to State Court Vanishes from Ruling's Official Version*, Texas Lawyer, Sept. 23, 1991, at 2, 3 (quoting Judge Jerry E. Smith). West Publishing, however, indicates that the critical section was included in the slip opinion received from the Clerk of the Fifth Circuit on August 7. A subsequent notice that this paragraph had been stricken caused its deletion in the final version published at 938 F.2d 40. *See id.*

7. Our brief order declining to answer specifically noted that a majority of this court believed that since the question presented was "dependent upon issues of fact," 32 Tex.Sup.Ct.J. at 623, it could not be properly answered in the limited scope of the certified question procedure.

8. The circumstances surrounding the *Hotvedt* certification are particularly curious. The issue presented had already been answered correctly based on Texas law at 914 F.2d 79 (5th Cir. 1990). On rehearing the court of appeals strangely reversed its position by applying the law of California and disregarding that of Texas. *See Hotvedt v. Schlumberger Ltd.*, 942 F.2d 294 (5th Cir.1991) (opinion on rehearing). This change occurred despite the thoughtful dissent of Judge Garza, *id.* at 298 (assuming that the question was declined because the Fifth Circuit had already correctly determined Texas law on the issue in its original opinion and protesting the majority's new resort to California law).

9. The question certified had already been addressed in *Bank of the Southwest v. National Surety Co.*, 477 F.2d 73 (5th Cir.1973). After the question was declined, this precedent was followed. *See Reliance Ins. Co. v. Capital Bancshares, Inc.*, 912 F.2d 756, 758 (5th Cir.1990) (following the district court's application of *Bank of the Southwest*).

10. "There are many prudential reasons ... why a [state] court may not wish to respond to particular questions at a given time. No supreme court should neglect its own docket simply to accommodate federal courts." Chief Justice Thomas R. Phillips, Certification of Questions of Law by Federal to State Courts, Presented to the Judicial Conference of the United States, Federal–State Jurisdiction Committee 7 (Jan. 16, 1992) (Manuscript on file with the Supreme Court of Texas).

11. That case, *Reliance Insurance, supra*, did take a period of time that is correctly characterized as "frustratingly long." *Jackson, supra*. A question filed here on August 15, 1989 was not declined until June 27, 1990. At my urging internal procedural rules and reporting requirements were instituted at our court in 1990 to reduce the incidence of such mishaps. This is the only instance in which this court has taken longer than four months to accept or decline certified questions.

12. Phillips, *supra* note 10, at 8.

ing our summer recess. The certifying court should also ensure that any record or stipulated statement of facts forwarded are sufficient to enable a proper answer to the question.[13] We want no misunderstanding concerning our willingness to cooperate fully with the federal courts to assure correct and expeditious adjudication. At the same time we know they will continue to respect our need to make independent decisions consistent with federalism.

## II.

The particular question to which we respond today concerns the construction of section 3.104 of the Texas Uniform Commercial Code, which provides that a negotiable instrument must

> contain an unconditional promise or order to pay a sum certain in money . . .[14]

Although this provision does not specifically include variable rate notes in the definition of negotiable instruments, the court concludes that a promissory note requiring interest to be paid at a rate that can be determined only by reference to an interest rate not included in the note is "a negotiable instrument as defined by the Texas Uniform Commercial Code." See p. 797. Today's opinion conflicts with the opinion of every court that has ever interpreted this Texas statute with only one exception.[15] Additionally it conflicts with the conclusion of the overwhelming majority of those courts considering the same provision in other states.

Use of an interest rate that cannot be calculated from information on the face of the note has been consistently held to violate the Texas statute's "sum certain" re-

quirement. *See Dillard v. NCNB Texas Nat'l Bank*, 815 S.W.2d 356, 360 (Tex. App.—Austin 1991, no writ) (negotiability defeated by provision for interest at "Lender's Prime Rate Plus 2.00%" because it "precluded the calculation of a 'sum certain in money'"); *Lexington Ins. Co. v. Gray*, 775 S.W.2d 679, 682 (Tex.App.—Austin 1989, writ denied) (note with variable interest rate set by issuer is nonnegotiable); *In re Gas Reclamation, Inc. Securities Litig.*, 741 F.Supp. 1094, 1102–03 (S.D.N.Y. 1990) (note bearing specific bank's prime rate interest nonnegotiable under Texas law because a "holder of a negotiable instrument must be able to calculate the amount of any interest due without reference to any outside source"), *appeal dism'd sub nom. Abish v. Northwestern Nat'l Ins. Co.*, 924 F.2d 448 (2d Cir.1991); *National Union Fire Ins. Co. v. Alexander*, 728 F.Supp. 192, 195, 200 (S.D.N.Y. 1989) (note charging interest at "the lesser of the maximum rate allowed by law or two percent (2%) above the 'prime rate' then charged by the Cullen/Frost Bank of Dallas, N.A." nonnegotiable).[16]

Because a rate of "[t]hree percent (3.00%) over Chase Manhattan Prime to be adjusted monthly," though readily ascertainable from published sources, could not be found within the "four corners" of a note, it was declared nonnegotiable in *Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191, 194 (1987). The Virginia Supreme Court concluded that:

> [T]he drafters of the Uniform Commercial Code adopted criteria of negotiability intended to exclude an instrument which requires reference to any source outside

---

**13.** In a situation involving a record which has been substantially supplemented following the decision to certify, the certifying court should give careful consideration to modifying its certification order to comport with the supplemented record.

**14.** Tex.Bus. & Com.Code Ann. § 3.104(a)(2).

**15.** That one exception is *Tanenbaum v. Agri-Capital, Inc.*, 885 F.2d 464, 468–89 (8th Cir. 1989).

**16.** In *National Union Fire Insurance Co. v. Cooper*, 729 F.Supp. 1423 (S.D.N.Y.1989), notes provided for interest at 10% per annum before

maturity and for interest after default of "two percent (2%) above the 'prime rate' then being charged by RepublicBank Dallas, N.A." *Id.* at 1436. The court concluded that under the Texas Uniform Commercial Code, "the rate of two percent above prime would render the note[s] nonnegotiable if it applied to the entire life of the note[s]." *Id.* at 1437. However, since the notes did not invoke the "variable rate" provision until after default, the court distinguished the case before it from leading cases on the nonnegotiability of variable rate notes.

the instrument itself in order to ascertain the amount due, subject only to the exceptions specifically provided for by the U.C.C.

*Id.* As a further policy justification for its decision, the court noted that:

> The U.C.C. introduced a degree of clarity into the law of commercial transactions which permits it to be applied by laymen daily to countless transactions.... The relative predictability of results made possible by that clarity constitutes the overriding benefit arising from its adoption.... Accordingly, we decline the appellee's invitation to create an exception, by judicial interpretation, in favor of instruments providing for a variable rate of interest not ascertainable from the instrument itself.

*Id.* 360 S.E.2d at 195.[17]

The effect of U.C.C. § 3-106 on a note assessing interest "at a rate of 1% above the 'floating prime or equivalent rate' charged ... by [the lender]" was considered recently in *Chemical Bank v. D3J Associates L.P.*, 14 U.C.C.Rep.Serv. (Callaghan) 790, 791, 1991 WL 58049 (D.Md. April 16, 1991).[18] Finding that the "vast majority" of courts deciding the question had determined that a variable interest rate provision defeated a note's negotiability, *see id.* at 793, a conclusion supported by the official comment to § 3-106, *see id.* at 794, the court held that "a variable interest rate was not a sum certain under Maryland law and that holders of notes containing such interest rates could not be holders in due course." *Id.*

Numerous other state and federal courts have reached similar conclusions. *See, e.g.,* *New Conn. Bank & Trust Co. v. Stadium Mgmt. Corp.*, 132 B.R. 205, 208-09 (D.Mass.1991) (an interest provision that cannot be determined without reference to an external, variable rate renders a note nonnegotiable); *Northern Trust Co. v. E.T. Clancy Export Corp.*, 612 F.Supp. 712, 715 (N.D.Ill.1985) (where interest cannot be computed without reference to the lender's prime rate, "the sum payable is uncertain and the instrument is nonnegotiable"); *Farmers Prod. Credit Ass'n v. Arena*, 145 Vt. 20, 481 A.2d 1064, 1065 (1984) (note providing for variable interest rate is nonnegotiable).[19]

The court today rejects all of these decisions in favor of the minority view that variable interest rate notes are included within the definition of negotiable instruments, even in the absence of specific statutory language affording them such a status. Two of the cases supporting the minority position are particularly unpersuasive, since they interpret different versions of the U.C.C., amended specifically to include variable interest rate clauses within the definition of negotiable instruments. See *First City Federal Savings Bank v. Bhogaonker*, 715 F.Supp. 1216 (S.D.N.Y. 1989); *Schwegmann Bank & Trust Co. v. Falkenberg*, 931 F.2d 1081 (5th Cir.1991).[20]

---

17. *Accord New Conn. Bank & Trust Co. v. Stadium Mgmt. Corp.*, 132 B.R. 205, 209 (D.Mass. 1991) ("The primary importance of the Uniform Commercial Code is the certainty and uniformity which it provides for commercial transactions.").

18. As it existed in 1988, the Maryland statute contained the same language as the current Texas U.C.C. The Maryland Legislature subsequently amended this section to allow some variable interest rate provisions. *See infra* note 24.

19. *See also Morris v. Columbia Nat'l Bank of Chicago*, 79 B.R. 777, 780 & n. 2 (N.D.Ill.1987) (note nonnegotiable where the interest rate was computed at 3% over the prime rate); *Centerre Bank v. Campbell*, 744 S.W.2d 490, 498 (Mo.Ct. App.1988) (note provision that "interest may vary with bank rates charged to [payee]," barred

negotiability of the instrument); *A. Alport & Sons, Inc. v. Hotel Evans, Inc.*, 65 Misc.2d 374, 317 N.Y.S.2d 937, 939-40 (N.Y.Sup.Ct.1970) (note containing the provision "with interest at bank rates" is nonnegotiable).

20. In 1988, the New York legislature amended its version of § 3-106 to read:

> For purposes of [§ 3-106(1)] "a stated rate of interest" shall also include a rate of interest that cannot be calculated by looking only to the instrument but which is readily ascertainable by a *reference in the instrument to a published statute, regulation, rule of court, generally accepted commercial or financial index, compendium of interest rates, or announced rate of a named financial institution.*

N.Y.U.C.C. § 3-106(2) (McKinney 1991) (effective July 8, 1988). The legislative history of the bill indicated that the amendment was intended

Indeed, the court seems to rely on the fact that legislatures in several states have enacted such amendments following a judicial decision that variable rate notes are nonnegotiable. See pp. 795, 796. The Texas Legislature, as the court concedes, has declined to approve such an amendment. *See id.* Presumptuously, today's opinion does the very work which the Texas Legislature declined.

Nor do the interest rate provisions of the promissory notes in this case appear similar even to those notes held negotiable under the minority view. This particular promissory note requires the payment of:

> Interest on the principal amount remaining unpaid hereunder from time to time outstanding, at a rate per annum equal to the lesser of (a) the rate (the "Basic Rate") which is equal to *the sum of the prime interest rate (the "Prime Rate") for short-term loans published by Lender, plus 2 percent (2%) per annum,* which Basic Rate shall be variable and shall be adjusted for the term hereof, effective at the close of business on the

day of any such change in the Prime Rate; or, (b) the maximum lawful rate of interest (the "Maximum Rate") permitted by applicable usury laws....[21]

In contrast to those cases upholding the negotiability of variable interest rate notes, which involved reference rates that are widely published and readily ascertainable,[22] the interest that Mr. Amberboy and the other borrowers must pay cannot be readily determined by reference to a widely published rate. These notes purport to compute interest based on a short-term prime rate published by Societe de Banque Privee, the lender. However, its counsel admitted in oral argument that the lender has no published prime rate; instead, it calculates interest using the prime rate of an undisclosed third-party financial institution. These facts comport with neither the court's answer to the certified question, nor with most of the recent statutory amendments passed in other states to allow notes with variable interest rates to be negotiable.[23]

to encompass existing commercial practices. *See Bhogaonker,* 715 F.Supp. at 1219–20. This legislative enactment was dispositive of the question. *Id.*

This was also the case in *Falkenberg.* At the time the note was executed, Louisiana had a statute explicitly recognizing as negotiable any promissory note made for commercial or business purposes which contained an adjustable rate of interest. La.Rev.Stat.Ann. § 9:3509.1(A) (West 1991) ("Notwithstanding any other provisions of the law to the contrary, any person borrowing funds for commercial or business purposes ... may agree that the interest rate that is charged on the indebtedness may vary from time to time in accordance with the provisions of [ ] the promissory note.... Such conditions [shall not] destroy the negotiability of the promissory note...."), *quoted at* 931 F.2d at 1084.

21. *Ackerman v. FDIC,* 930 F.2d 3, 4 n. 2 (5th Cir.1991) (emphasis added). However, a number of the promissory notes contained as exhibits in the appellate record of this case contain different language and/or terms.· Specifically, the notes differ as to (1) who, if anyone, is designated as the "Lender," (2) whose short-term prime rate will serve as the reference rate, and (3) the percentage over prime the borrower is obligated to pay.

22. *See Tanenbaum, supra* (rate tied to London Interbank Offered Rate ("LIBOR")); *Klehm v. Grecian Chalet, Ltd.,* 164 Ill.App.3d 610, 115

Ill.Dec. 662, 518 N.E.2d 187 (1987) (rate varied with minimum prime rate of New York banks ·published in *The Wall Street Journal*); *Goss v. Trinity Savings & Loan Ass'n,* 813 P.2d 492 (Okla.1991) (variable interest rate tied to Treasury bill rates); *Bhogaonker, supra* (rate tied to lender's published rate in New York); and *Falkenberg, supra* (rate based on published rate of Citibank, N.Y.).

23. Indeed, a review of the Notes included in the record before this court suggests that they would probably be negotiable only in Delaware, Iowa, North Dakota, Tennessee, and West Virginia. *See, e.g.,* Del.Code Ann. tit. 6, § 3–106(1)(f) (Michie Supp.1990); Iowa Code Ann. § 554.-3106(1)(f) (West Supp.1991) (both allowing "a variable rate of interest, even though determinable with reference to a source other than the instrument"). The other states which have amended their versions of § 3–106 demand a higher level of commercial certainty. *See, e.g.,* Fla.Stat. Ann. § 673.106(2) (West Supp.1992); Ky.Rev.Stat.Ann. § 355.3–106(2) (Michie/Bobbs–Merrill Supp.1990); Md.Com.Law Code Ann. § 3–106(2) (Michie Supp.1991); Mo. Ann.Stat. § 400.3–106(2) (Vernon Supp.1992); Nev.Rev.Stat. § 104.3106(2) (1991); Va.Code Ann. § 8.3–106(2) (Michie Supp.1991) (all requiring that the rate is "readily ascertainable by a reference in the instrument to a published statute, regulation, [rule of court,] generally accepted commercial or financial index, compen-

### III.

Though I disagree with the answer provided here by a majority of my colleagues, it should be clear that our court gives careful attention to disputed questions of state law. The very nature of our debate demonstrates the reason why such matters should be certified by the federal courts for our consideration.

MAUZY, HIGHTOWER and GAMMAGE, J., join in this concurring and dissenting opinion.

dium of interest rates, or announced or established rate of a named financial institution").

Whether or not these notes would be negotiable under Louisiana statutory law is unclear. *See* La.Rev.Stat.Ann. § 10:3–106(1)(a) (West Supp.1992) (providing that "[a]n interest rate may be fixed or variable and may be stated or described in the instrument in any manner, provided that where an instrument provides for a variable interest rate such provision shall be subject to the Variable Rate Regulations promulgated by the office of financial institutions").