United States Court of Appeals,

Fifth Circuit.

No. 92-2394.

Robert L. RANDOLPH, et al., Plaintiff-Counter Defendants Appellants,

v.

RESOLUTION TRUST CORPORATION, As Receiver for First South Savings Association, Defendant-Counter Plaintiff Cross Plaintiff Third Party Plaintiff Appellant-Appellee,

v.

PHILLIPS, KING & SMITH, Attorneys at Law, et al., Defendants Cross Defendants Appellees,

v.

E. ASHLEY SMITH, P.C., et al. Third Party Defendants Appellees.

July 19, 1993.

Appeal from the United States District Court for the Southern District of Texas.

Before WISDOM, DAVIS, and SMITH, Circuit Judges.

PER CURIAM:

I.

A.

In 1984, John Beeson entered into an agreement with two other individuals to purchase a controlling interest in Lincoln Savings & Loan ("Lincoln") in Miami, Florida. As counsel, the investors chose the firm of Phillips, King & Smith (the "Firm"). The Federal Home Loan Bank Board ("FHLBB") objected to the participation of the two individuals, and they withdrew. Beeson then collected a group of other investors, including five of the appellants here (the Five Investors), and completed the transaction with the help of the Firm.

During this period, the Firm learned that the FHLBB might raise questions about potential acting-in-concert violations involving the purchase of Lincoln. "Acting in concert" refers to the aggregation of voting power when one or more persons, purporting to act independently, are actually acting as a group. The Firm's alleged knowledge of these potential problems was a central issue in the district court.

On January 5, 1985, First South loaned Beeson and the other investors over $5.4 million for the purchase of Lincoln.  As security, Beeson pledged shares of common stock of Lincoln as well as 7.6382 acres of Texas real estate.  On January 7, 1985, Beeson, the Five Investors, and several other investors purchased a controlling interest in Lincoln, with the aid of the Firm.

In August 1985, the FHLBB began to investigate Lincoln, and the FHLBB examiner raised the acting-in-concert problem.  Beeson consulted with the Firm regarding the issue, and the Firm decided that Beeson should buy out some of the other investors to attempt to solve the problem.  On September 30, 1986, Beeson obtained from First South an extension and renewal of his earlier loan for $2,576,000 and a new loan for $689,295.50.  As security, Beeson pledged 237,120 shares of Lincoln stock and his interest in two additional pieces of real estate.

In 1987, the FHLBB required Beeson and the Five Investors to withdraw from participation in Lincoln and placed Beeson's stock in trust.[1]  In June 1988, First South notified Beeson that it was accelerating his $2,576,000 note for failure to make payments on time.  First South sent notices of default to Beeson on August 4, 1988, and to the other investors on January 19, 1989.

B.

On January 31, 1989, First South initiated separate lawsuits against the Five Investors in the state district court.  Beeson joined with the Five Investors in a separate suit against First South and the Firm on February 2, 1989, charging that the Firm and First South had fraudulently induced them to enter into the loan transactions that gave rise to the notes without disclosing their knowledge of potential regulatory problems that would arise in the stock transactions for which the funds were being borrowed.  Beeson and the Five Investors (collectively, the "Plaintiffs") further contend that the fraudulent conduct caused the FHLBB to remove them from control of Lincoln, thus preventing them from infusing additional capital into Lincoln and using their expertise to save Lincoln.

On March 15, 1989, the FHLBB appointed the FSLIC conservator of First South pursuant to the Home Owners' Loan Act of 1933 and the Housing Act.  Acting on behalf of the FSLIC, the

---

[1]Lincoln was taken over by the Federal Savings and Loan Insurance Corporation ("FSLIC") in 1989 and later placed under the conservatorship of the Resolution Trust Corporation ("RTC"). Its stock is worthless.

Federal Deposit Insurance Corporation ("FDIC") removed all of the state court actions to federal court on April 14, 1989. With the enactment, on August 9, 1989, of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Resolution Trust Corporation ("RTC") replaced the FSLIC as conservator of First South. The district court consolidated the actions on August 15, 1989. The RTC later was appointed receiver of First South and now litigates in that capacity. On April 27, 1992, the district court granted several motions for summary judgment; this appeal followed.

The district court held that Beeson and the Five Investors could not succeed on their fraudulent inducement theory, as it was barred by the *D'Oench, Duhme* doctrine. *See D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The district court also held that the legal malpractice actions of Beeson and the RTC were barred by the statute of limitations, while the malpractice action of the Five Investors was barred because there was no privity of contract.

## II.

First, the Plaintiffs argue that the district court erred in holding that their defense of fraudulent inducement was barred by the doctrine of *D'Oench, Duhme.* While this appeal was pending, the RTC sold the promissory notes of appellants Johnson, Randolph, Ranzau, and Altman. As to these notes, this appeal is moot. The RTC still retains three notes, however, thus requiring us to address the merits of the Plaintiffs' argument.

### A.

Plaintiffs allege that their promissory notes are not negotiable because they employ a variable interest rate based upon a prime rate that is not ascertainable from the face of the note. In *Amberboy v. Societe de Banque Privee,* 831 S.W.2d 793 (Tex.1992), the court held that promissory notes based upon the prime rate of an identified bank satisfied the "sum certain" requirement, thereby preserving negotiability. The court thus carved an exception to the "four corners" rule that requires the "sum certain" to be calculable from the instrument itself without reference to an outside source. *See* TEX.BUS. & COM.CODE ANN. § 3.106, comment 1 (Vernon 1968). The *Amberboy* decision,

however, limits this narrow exception to situations where the prime rate is published or readily ascertainable by any interested person. 831 S.W.2d at 796.

Here, the Plaintiffs assert that the interest rates for the various notes are not ascertainable from the face of the notes, thereby making them nonnegotiable. We find it unnecessary to decide whether these notes are negotiable, as the *D'Oench, Duhme* doctrine may defeat Plaintiffs defenses to collection regardless of negotiability. *See RTC v. Montross,* 944 F.2d 227, 228 (5th Cir.1991) (per curiam) (en banc); *Park Club, Inc. v. RTC,* 967 F.2d 1053, 1055 (5th Cir.1992). Although holder in due course status affects the types of defenses available against the RTC, these defenses still must be ascertainable from the records of the bank at the time the RTC takes control of the bank.

### B.

The plaintiffs argue that First South fraudulently induced them to sign the promissory notes. In *Kilpatrick v. Riddle,* 907 F.2d 1523 (5th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991), we held that claims of fraudulent inducement were barred by *D'Oench, Duhme* even if the FDIC had prior knowledge of the fraud. We find no meaningful distinction between the present case and *Kilpatrick.*

### C.

Plaintiffs argue that because they had filed suit prior to the failure of First South, the FDIC had knowledge of the fraud because the pleadings in the Plaintiffs' suit were among the "records of the bank' when the FDIC took over. We reject this argument. Past precedent indicates that the term "records of the bank' refers to the note itself or related loan documents. *See Langley v. FDIC,* 484 U.S. 86, 91-92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987). We hold that pleadings of a lawsuit do not constitute "records of the bank' for the purpose of applying *D'Oench, Duhme.*

As the Court stated in *Langley,* the *D'Oench, Duhme* doctrine "allow[s] federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets ... [and] ensure[s] mature consideration of unusual loan transactions ... [thereby] preventing fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." 484 U.S. at 91-92, 108 S.Ct. at 401. Thi s passage suggests that the *defense* to payment of the note must be

based upon evidence in the bank's records; it is not sufficient that the bank's records give *notice* of the defense.

Here, the defense is barred because, although the FDIC may have been put on notice of plaintiffs' defense, the defense itself cannot be supported by records of the bank. Were we to hold otherwise, federal and state banking authorities would be required to speculate as to the outcome of various lawsuits pending against the bank where such outcomes depend on oral testimony of bank officials. Such uncertainty is precisely what *D'Oench, Duhme* seeks to avoid. We affirm the district court's holding on this issue.[2]

### III.

Second, the Five Investors contend that the district court erred in granting summary judgment on their legal malpractice claim against the Firm. The district court held that no attorney-client relationship existed between the Five Investors and the Firm, thus barring a legal malpractice claim, as the parties were not in privity of contract. In reviewing the judgment, we view the facts in a light most favorable to the Five Investors and engage in a *de novo* application of the law to these facts.

In Texas, an attorney-client relationship may be implied from the conduct of the parties. *Kotzur v. Kelly,* 791 S.W.2d 254, 257-58 (Tex.App.—Corpus Christi 1990, no writ). An attorney may be held negligent when he fails to advise a party that he is not representing that party, when circumstances lead the party to believe that the attorney is representing him. *Id.* Because each case presents unique circumstances, we must be cautious to avoid granting summary judgment prematurely.

In *Kotzur,* a son bought a piece of property from his father. The father hired Kelly to prepare the documents for the transaction, and Kelly represented to the parties at the closing that the property had no liens on it, other than those shown on the deed. The son later had to pay off a lien that Kelly had missed, and he sued Kelly for malpractice. In reversing a summary judgment in favor of Kelly

---

[2]Beeson also raises an issue as to the failure of delivery as to one note. Because Beeson accepted the loan proceeds, any defect was cured. *See Texas Reserve Life Ins. Co. v. Security Title Co.,* 352 S.W.2d 347 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.) (express ratification of a defective delivery renders it a good delivery).

on the privity issue, the court stressed several facts. First, Kelly knew the son did not have a separate attorney, and he admitted that he had prepared the documents on a "family-type" basis. Second, the son testified that it was his impression that Kelly was handling the documents and that he thought Kelly was representing him. Third, the son noted that Kelly never had told him that he was not representing the son or that the son should retain a separate lawyer. Finally, the closing statement reflected a charge to the son for attorneys' fees.

We find this case similar enough to *Kotzur* that we vacate the judgment of the district court and remand. The Five Investors instructed Beeson to arrange for legal representation for himself and the other investors in connection with the Lincoln purchase. Interpreting the facts most favorably to the Five Investors, Beeson acted as their agent.

None of the Five Investors had any legal representation other than from the Firm, either in connection with the purchase of Lincoln or with the investigation by the FHLBB. When First South made the loans, some of the loan proceeds intended for the Five Investors were paid to the Firm for legal fees. The Firm requested and obtained conflict of interest waivers from three of the Five Investors as well as from Beeson and the other original investors. The Firm also prepared option agreements to allow two of the initial investors to purchase a portion of Beeson's stock.

This evidence is sufficient to reverse the summary judgment. The Firm relies upon the Five Investors' answer to interrogatories 5 and 10, which inquired as to when each person retained the law firm and what he consulted the firm about. The answers were as follows:

> 5. I have never directly consulted the "defendant-attorney' ... rather the "defendant-attorney' was retained by John S. Beeson, one of the Plaintiffs herein, for legal representation and advice in connection with the purchase by Plaintiffs and others of Lincoln Savings Association.

> 10. As stated above, the "defendant attorney' was retained by the Plaintiff John S. Beeson to represent all purchasers of Lincoln Savings Association.

Because this evidence shows that none of the Five Investors ever dealt directly with any attorney of the Firm, the Firm argues that this proves that no attorney-client relationship existed. We disagree. As we noted above, the Five Investors contend that Beeson retained the Firm for himself and as agent for the Five Investors. Viewing the evidence most favorably to the Five Investors, this

evidence is consistent with the Five Investors' theory.[3]

We also reject the Five Investors' argument that they may sue for legal malpractice even if there was no attorney-client relationship because the Firm knew that Beeson would supply the Five Investors with information. This argument has no merit. Texas courts repeatedly have held that only one in privity of contract with an attorney may maintain a legal malpractice action against him. *E.g., Dickey v. Jansen,* 731 S.W.2d 581 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

Given our resolution of this issue, we reverse summary judgment on the Five Investors' legal malpractice claim. A material issue of fact exists as to the question of whether an attorney-client relationship existed between the Five Investors and the Firm, but only because the Five Investors have asserted that Beeson acted as their agent in retaining the Firm. As a result, when we consider whether the legal malpractice claims are barred by the limitations, Beeson's knowledge as agent must be imputed to the Five Investors. With this background in mind, we now turn to the statute of limitations issue.

IV.

Third, Beeson and the Five Investors contend that the district court erred in granting summary judgment in favor of the Firm on the ground that their legal malpractice claims were barred by Texas's two-year statute of limitations for legal malpractice claims, TEX.CIV.PRAC. & REM.CODE § 16.003. Plaintiffs filed their lawsuit on February 8, 1989, making the critical date for accrual February 8, 1987.

A.

As the Texas Supreme Court has observed,

> The general rule is that a cause of action sounding in tort accrues, in the absence of a statute to the contrary or fraudulent concealment, when the tort is committed. This rule obtains notwithstanding the fact that the damages, or their extent, are not ascertainable until a later date.... A legal injury must be sustained, of course, before a cause of action accrues.

---

[3]We reject the Firm's argument that the Five Investors did not plead that the Firm never told them the Firm was not representing them. The Five Investors pled that the Firm represented them; that allegation met the requirements of FED.R.CIV.P. 8. After properly pleading this allegation, the Five Investors were free to offer any evidence supporting it. The district court erred by holding that the Five Investors had to plead this fact, as such a standard would be plainly inconsistent with rule 8.

*Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967). *See also McClung v. Johnson,* 620 S.W.2d 644, 646 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.) (cause of action sounding in tort accrues when the tort is completed, that is, the act committed and damage suffered).[4] In other words, Texas law imposes two requirements for the accrual of a legal malpractice cause of action: (1) the commission of a tortious act and (2) the suffering of a legal injury.

B.

We understand the district court to have granted summary judgment based upon its findings regarding the "tortious act" requirement. The district court's order does not discuss the "legal injury" requirement.

We agree with the district court that no issue of material fact exists as to the first element. Beeson knew about the acting-in-concert problems long before the critical date. He even had negotiated with the FHLBB in an attempt to rectify the problem. If the Five Investors successfully prove that Beeson acted as their agent in establishing an attorney-client relationship, then Beeson's knowledge of the acting-in-concert problem also must be imputed to the Five Investors.

C.

1.

The second requirement, that legal injury must have occurred, presents a more difficult problem.[5] The Firm identifies three possible legal injuries that the plaintiffs allegedly suffered prior

---

[4]Texas courts have also held that the traditional discovery rule applies in legal malpractice cases. *Willis v. Maverick,* 760 S.W.2d 642, 646 (Tex.1988).

[5]The Firm argues that Beeson and the Five Investors are seeking to employ the discovery rule without pleading it. The parties disagree over who has the burden of pleading the discovery rule and whether the rule applies in this case. Although the discovery rule must be pled in state court, *see Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988), the same is not true in federal court, *see Wellborn v. Sears, Roebuck & Co.,* 970 F.2d 1420, 1425 (5th Cir.1992).

     Although the discovery rule still can be urged, it does not appear to apply in this case. Beeson's main argument is that he did not *suffer* legal injury until after the critical date. The discovery rule prevents a cause of action from accruing after the tortious act has been committed, and legal injury suffered, when the plaintiff has not discovered either the act or the injury. Here, Beeson knew about the alleged tortious act and about the events that the Firm alleges constitute legal injury. He can prevail only if he proves that these events do not constitute a legal injury, thereby making the discovery rule irrelevant.

to the critical date. First, it notes that the FHLBB began investigating Lincoln in mid-1985 regarding the acting-in-concert problem. In October 1985, the FHLBB issued its preliminary report, which concludes that Beeson and the others acted in concert. We do not think the issuance of a preliminary report constitutes a legal injury, however, as the Firm does not cite any authority indicating that a preliminary report would allow the government to take any coercive action.

At best, the filing of the preliminary report indicated that some legal injury was inevitable, but in Texas, even inevitable injury will not result in the accrual of a cause of action for limitations purposes in Texas. In *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967), an accountant made errors on the plaintiff's tax return in 1958 and 1960. The last tortious act occurred no later than December 31, 1960. The critical date for limitations purposes was September 30, 1961, so the two-year statute would have run by December 31, 1962; suit was not filed until September 30, 1963. On October 20, 1961, the Internal Revenue Service ("IRS") assessed a deficiency. The court held that no legal injury occurred until the IRS assessed the deficiency, quoting 54 C.J.S. *Limitation of Actions* § 168, at 122-23, for the following test of when a cause of action accrues:

> The test to determine when the statute of limitations begins to run against an action sounding in tort is whether the act causing the damage does or does not of itself constitute a legal injury, that is, an injury giving rise to a cause of action because it is an invasion of some right of plaintiff. If the act is of itself not unlawful in this sense, and plaintiff sues to recover damages subsequently accruing from, and consequent on, the act, the cause of action accrues, and the statute begins to run, when, and only when, the damages are sustained; and this is true although at the time the act is done it is apparent that injury will inevitably result.

417 S.W.2d at 153.

Applying *Atkins* to this case, we conclude that a mere investigation and preliminary report of the FHLBB does not constitute a legal injury, as the FHLBB had not yet taken any action that invaded a right of the plaintiffs. In *Atkins,* the cause of action accrued when the deficiency was assessed, not when the audit proceeding began. The *Atkins* court also cited to a case involving the question of when a cause of action accrues for negligent failure of an insurance company to settle a lawsuit. The court concluded that the cause does not accrue until final judgment is reached, as the tort was not completed until that time, for no right had been invaded by the failure to accept settlement offers. 417 S.W.2d at 153-54. Similarly, here, a preliminary report in no way invades any

right of the plaintiffs as, at that point, Beeson and the Five Investors might have successfully challenged the findings in the preliminary report.

2.

We find merit in the Firm's second argument. In response to the investigation by the FHLBB, Beeson attempted to rectify the situation by buying out two of the other investors. To accomplish this buyout, Beeson had to take out further loans from First South. Beeson argues that buying the other stock cannot be equated with damage to him, because if it had not been for the Firm's malpractice, the stock purchase may well have been advantageous to him. This may be true, but Beeson went further into debt and purchased stock in an attempt to rectify a problem allegedly caused by the Firm's malpractice. Although it was Beeson's choice to attempt to rectify the situation in this manner, he entered into the transaction because of the acting-in-concert problem. We believe that this constituted a legal injury. We therefore affirm as to Beeson.

3.

Beeson's buyout, however, did not cause further expense to the Five Investors. As a result, we must consider the third alleged legal injury. The Firm argues that plaintiffs were damaged when the FHLBB issued its final exam report in February 1986 and sent Beeson two proposed cease and desist orders on July 8, 1986.

We asked the parties to submit supplemental briefing on the effect of these proposed orders. Unfortunately, we cannot adequately determine, from the present state of the record, exactly what effect those orders had on the legal rights of the Five Investors. If the proposed orders affected the Five Investors, they may well have suffered legal injury.

Because the proposed orders do not appear in the record, the district court is in a better position to resolve the issue as to whether legal injury occurred. We therefore vacate the summary judgment as to the Five Investors and remand for a determination of whether a material issue of fact exists as to whether they suffered any legal injury prior to the critical date. In making this determination, the district court should carefully consider the holding in *Atkins.* There, the cause of action did not accrue until the IRS issued a deficiency. The time at which the IRS began investigating

Atkins apparently was irrelevant and is not mentioned in the opinion. Here, the Final Exam report may do nothing more than warn the plaintiffs that future coercive action is inevitable. But, inevitable injury does not constitute sufficient injury to begin the running of the statute of limitations under *Atkins.*

V.

The RTC argues that the district court erred in granting summary judgment on its legal malpractice claim as time-barred because principals at First South were aware of the possible acting-in-concert problems more than two years prior to the time the RTC filed its complaint. Again, the district court does not appear to have made a finding as to when First South suffered legal injury. In the district court, the RTC apparently argued that FIRREA revives an otherwise stale claim under 12 U.S.C. § 1821(d)(14). The district court rejected this argument, and we since have ruled that FIRREA does not revive stale claims. *See FDIC v. Belli,* 981 F.2d 838, 842-43 (5th Cir.1993).

Accordingly, the relevant statute of limitations is 28 U.S.C. § 2415, which denotes a three-year period for tort actions brought by the government.[6] Under this statute, our inquiry is whether the cause of action accrued prior to April 24, 1986—three years before the suit was filed. Of course, this would be the critical date only if the claim was not stale under the state statute of limitations when First South failed.

We previously have noted that neither section 2415 nor section 1821(d)(14) revives claims barred under state law where the FDIC takes over after the claim has prescribed. *See Belli,* 981 F.2d at 842 (section 1821(d)(14)); *FDIC v. Wheat,* 970 F.2d 124, 128 n. 7 (5th Cir.1992) (citing *United States v. Sellers,* 487 F.2d 1268, 1269 (5th Cir.1973)) (section 2415)). The FSLIC took over First South on March 15, 1989. Because the FSLIC filed the relevant claims against the Firm one month later, the relevant question becomes whether the claims were barred under Texas law on March 15, 1989; if the cause of action accrued before March 15, 1987, it is barred by the state statute of

---

[6]The RTC's attempt to recharacterize a legal malpractice action as a contract action rather than a tort action is unpersuasive. Under Texas law, a legal malpractice action sounds in tort. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). Although we are interpreting a federal statute of limitations, we think it proper to rely upon state characterizations of state causes of action for limitations purposes.

limitations and may not be revived by federal law.

Assuming that the claim is not barred under Texas law, it is timely under federal law, as the FSLIC filed it within the three-year federal limitations period, because a finding in favor of the RTC on the state law issue means that the claim must have accrued after April 24, 1986. Because the critical date under federal law is April 24, 1986, nearly one year earlier than the critical date under state law, the only relevant inquiry is whether the claim has prescribed under Texas law.[7]

The RTC first argues that a cause of action does not "accrue,' under the meaning of that term in section 2415, until the governmental entity acquires the claim in question. We rejected that reading in *Belli,* 981 F.2d at 840-42. Although in *Belli* we interpreted section 2415(a), our rationale is equally applicable to the provision at issue here, section 2415(b). The former provision deals with contract actions, while the latter addresses tort actions. The relevant language is identical. As a result, we reject the RTC's first argument.

The RTC next argues, as did Beeson and the Five Investors, that it did not sustain damages as a result of the breach of duty before the critical date. As we noted above, the cause of action does not accrue until the breach of duty causes a legal injury. The RTC argues that it did not sustain any such injury until it was forced to look to the collateral for payment on the notes. The RTC asserts that the Firm produced no evidence in the summary judgment record to establish when First South sustained damages as a result of the alleged breach of duty.

Because the district court failed to make findings as to when First South suffered legal injury, we vacate the judgment as to the RTC's malpractice claim and remand for further proceedings.[8] The

---

[7]In other words, legal malpractice claims brought by the RTC on behalf of a financial institution involve two different critical dates for limitations purposes. First, the government must take over the institution before the cause of action has gone stale under state law, in this case meaning that the time between accrual of the cause of action and the government takeover of the institution must be less than two years. Second, even if the government takes over the failed institution before the claim has gone stale under state law, the government must file the action within three years of the accrual of the claim. A court ordinarily will have to decide only one of the two issues, because the answer to one will dictate the result of the second.

[8]The RTC's second amended complaint alleges that the Firm's malpractice caused the FHLBB to attack the borrowers' change of control application, which caused the borrowers' stock in Lincoln to become worthless, which, in turn, left first South's loans to the borrowers inadequately secured. Assuming these well pleaded facts are true, it is not evident why the FHLBB's February

district court is better situated to decide whether a material issue of fact exists as to when First South suffered a legal injury. The record is sufficiently opaque that we cannot determine with certainty that a material issue of fact does not exist on this issue.[9]

## VI.

In summary, we AFFIRM the grant of summary judgment in favor of the RTC on the promissory notes as to Beeson and Foster and DISMISS the appeals of Johnson, Randolph, Ranzau, and Altman on this issue as moot. We AFFIRM the grant of summary judgment against Beeson on his malpractice claim and VACATE the summary judgment against Foster, Johnson, Randolph, Ranzau, and Altman on their malpractice claims and REMAND for further proceedings. We VACATE the summary judgment against the RTC on its legal malpractice claim and REMAND for further proceedings.

---

1986 final examination report and proposed cease and desist orders did not cause an immediate reduction in the value of the borrowers' stock in Lincoln. It is even less plain why the reduction in the value of the stock did not reduce the value of the promissory notes secured by the stock, and, therefore, constitute injury to First South. Nevertheless, the parties did not flesh out these arguments well in their briefs, and we leave them to the district court for its determination.

[9]Charles Phillips was the Chairman of First South and a partner of the Firm. The RTC argues that Phillips's knowledge should not be imputed to First South for the purpose of applying the discovery rule. Although this assertion has merit, the summary judgment record contains ample evidence to indicate that other officers of First South knew of the acting-in-concert problems and the Firm's involvement with the Lincoln transaction well before the critical date. As a result, we agree with the district court that First South had notice of the alleged breach of duty prior to the critical date. The RTC also raises the "adverse domination theory" on appeal. Because the RTC did not raise this argument in the district court, however, we elect not to address it for the time on appeal. *See Boddie v. City of Columbus,* 989 F.2d 745, 752 (5th Cir.1993).