TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING







NO. 03-99-00318-CV






The Cadle Company, Appellant



v.



Regency Homes, Inc. and Gene Rutland, Appellees






FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT


NO. 149,538-B, HONORABLE RICK MORRIS, JUDGE PRESIDING 







 The opinion and judgment issued herein on March 30, 2000 are withdrawn, and
the following opinion is substituted in lieu of the earlier one.

 Appellant, The Cadle Company (Cadle), brought suit against appellees, Regency
Homes, Inc. (Regency) and Gene Rutland, (1) guarantor, for payment of three promissory notes. 
The case was tried to the bench. Finding that the notes had been paid and that Cadle did not own
the guaranty, the trial court ordered that Cadle take nothing against either defendant. We hold
that the take-nothing judgment is not supported by any of the grounds advanced and that the trial
court erred in concluding that Cadle did not own the guaranty. We will reverse and remand to
the district court for a new trial.


FACTUAL AND PROCEDURAL BACKGROUND


 Regency, a now-defunct corporation engaged in homebuilding, executed three notes
payable to Texas American Bank/Temple on October 11, 1988: one for $10,000, one for
$25,062.19, and one for $88,977.60. (2) The notes all provided for variable interest rates that
fluctuated according to the bank's prime rate. All three notes matured on April 10, 1989. Texas
American Bank failed on July 20, 1989. Regency and Rutland do not dispute that the originals
of these notes, signed by Rutland, were entered in evidence during the trial. Each note referenced
a security agreement that no party was able to locate.

 On March 4, 1988, Rutland, as president and sole shareholder of Regency,
executed an unlimited personal guaranty of Regency's indebtedness to Texas American Bank; he
agreed to guarantee "the prompt and full payment to Bank of all indebtedness and liabilities of all
kinds which are now or hereafter may be owing to Bank [by Regency]." Rutland does not dispute
that the original guaranty he signed was entered into evidence during the trial.

 After Texas American Bank failed, the Federal Deposit Insurance Corporation
(FDIC) transferred the bank's assets to Team Bank, which later merged with Bank One. Cadle
purchased the three notes in question from Bank One on November 29, 1993. The loan sale
agreement package contained Regency's three promissory notes and Rutland's original guaranty;
it did not contain a security agreement. The notes were endorsed from the FDIC to Bank One,
and from Bank One to Cadle. The endorsements were not challenged at trial nor are they
challenged on appeal. None of the three notes was marked paid, in full or in part. 

 Believing that the notes were in default, Cadle demanded payment from both
Regency and Rutland in June 1994. When appellees failed to respond, Cadle filed this suit in July
1994. Appellees waited more than three years to file an answer.

 Following a bench trial, the trial court rendered a take-nothing judgment against
Cadle and entered findings of fact and conclusions of law. In nine points of error, Cadle
challenges nine of the findings of fact and all seven conclusions of law. 


STANDARD OF REVIEW In seven of its nine points of error, Cadle challenges the legal and factual
sufficiency of the evidence to support certain findings of fact by the trial. We attach to a court's
findings of fact the same weight that we attach to a jury's verdict upon jury questions. See
Lawyers Sur. Corp. v. Larson, 869 S.W.2d 649, 653 (Tex. App.--Austin 1994, writ denied). To
review the evidence under a legal insufficiency or no-evidence point, we consider all the evidence
in the light most favorable to the prevailing party, indulging every reasonable inference in that
party's favor. See Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285-86
(Tex. 1998). We will uphold the finding if more than a scintilla of evidence supports it. See
Burroughs Welcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995). The evidence supporting
a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given
the facts proved in the particular case. See id. 

 When reviewing the factual sufficiency of the evidence, we must consider and
weigh all the evidence and should set aside the judgment only if the evidence is so weak or so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We will not substitute our judgment for that of the
trier of fact merely because we might reach a different conclusion. See Westech Eng'g, Inc. v.
Clearwater Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App.--Austin 1992, no writ).


TAKE-NOTHING JUDGMENT

 To collect on a promissory note, a plaintiff must establish: (1) the existence of the
note in question, (2) the defendant signed the note, (3) the plaintiff is the owner and holder of the
note, and (4) a certain balance is due and owing on the note. See Commercial Serv. of Perry, Inc.
v. Wooldridge, 968 S.W.2d 560, 564 (Tex. App.--Fort Worth 1998, no pet.). Establishing the
amount of interest owed can be problematic when the note in question contains a variable interest
rate, as is the case in this dispute; the difficulty grows when the variable interest rate is indexed
to the prime rate of a defunct bank. Even if the holder of the note succeeds in establishing the
elements entitling it to collection, the debtor may defeat collection by asserting and proving the
affirmative defense of payment. See Southwestern Fire & Cas. Co. v. Larue, 367 S.W.2d 162,
163 (Tex. 1963). If the debt is secured by a lien on intangible property, such as a note receivable,
and a creditor wishes to sue for a deficiency after foreclosing the lien, it must first give the debtor
notice of the intent to dispose of the property and must dispose of the property in a commercially
reasonable manner. See Tex. Bus. & Com. Code Ann. § 9.504 (West 1991).

 The trial court's findings of fact and conclusions of law reveal several bases for its
take-nothing judgment against Cadle. First, the trial court found that each of the three promissory
notes had been paid or compromised in full. Additionally, the court held that Cadle did not prove
that a certain balance was due on any of the promissory notes. Apparently the trial court reached
this conclusion because of the variable interest rate set forth in each note. Seemingly for the same
reason, the trial court concluded that the notes were not, and never had been, negotiable
instruments. Further, the court found that the defendants were not indebted to Cadle because a
predecessor in interest had not disposed of collateral in a commercially reasonable manner. See
id. Cadle attacks each of these conclusions and raises factual and legal sufficiency challenges to
the underlying findings of fact. We address each ground that might support the take-nothing
judgment. In reviewing the evidence we, like the trial court, are presented with a confusing and
disjointed record of the transactions relevant to resolution of this dispute.


I. Payment

 Cadle's possession of the original notes, Rutland's acknowledgment that he
executed them, and the fact that the notes were not marked paid, constituted prima facie proof that
the notes remained unpaid. See Naylor v. Gutteridge, 430 S.W.2d 726, 731 (Tex. App.--Austin
1968, writ ref'd n.r.e.). Rutland raised the affirmative defense of payment, and the trial court
found that all three notes had been paid. On appeal, Cadle contends that the evidence is legally
and factually insufficient to support this finding. See Larue, 367 S.W.2d at 162 (defendant has
burden to prove affirmative defense of payment); Titlow v. Devine, 650 S.W.2d 143, 144 (Tex.
App.--Houston [14th Dist.] 1983, no writ) (defendants required to prove payment by
preponderance of the evidence). (3) 

 We first address whether Rutland established that the $88,873.26 note held by
Cadle had been paid. At trial, Rutland contended that the $88,873.26 note was actually a renewal
of an interim construction loan and had been paid by foreclosure on the collateral securing the
loan. In 1985 Regency obtained an interim construction loan from Texas American Bank (the
bank) in the original sum of $82,750 to finance construction of a house that Regency built at 410
Northcliffe Drive in Belton. In 1987 Regency sold the home, taking a note receivable from Jack
and Donna Brown for $104,025 (the Brown note receivable). The $82,750 interim construction
loan was not paid off at that time. Instead, Regency claims to have renewed the interim
construction note plus interest in some amount approximating $88,000. (4) Regency pledged the
Brown note receivable to the bank as security for this renewal note and for a $10,000 note that
represented the accumulation of interest that Regency owed the bank on other indebtedness. The
bank's release of lien securing the original $82,750 interim construction note, Regency's deed to
the Browns, the Browns' Deed of Trust in favor of Regency, and Regency's transfer of lien in
favor of the bank were all executed on November 17, 1987. All of these documents are in the
record. What is not in the record is the security agreement or the note representing the renewal
of the interim construction loan; we do not even know the principal amount of that note. But
Rutland asked the trial court to believe, and the trial court apparently did believe, that this renewal
of the interim construction loan was the $88,873.26 note held by Cadle. Rutland and the trial
court further assumed that the $10,000 note held by Cadle was the same $10,000 note that was
also secured by the Brown note receivable of $104,025.

 According to Rutland, monthly payments from the Browns were deposited into
Regency's bank account and then "swept" out by the bank to apply to Regency's indebtedness. 
Rutland did not introduce bank records to identify the account into which these deposits were
made, how many payments were made, how much credit was applied to Regency's indebtedness,
or which indebtedness was reduced by the credits. The transfer of lien executed by Regency in
favor of the bank on November 17, 1987 stated that it was being made to secure indebtedness
described in a security agreement of even date; that security agreement was never introduced into
evidence. Nothing other than Rutland's vague recollections, which were contradicted, served to
identify the indebtedness secured by the Brown note receivable or credited with payments from
the Browns. (5) There is no evidence of how much credit was applied, when it was applied, or to
which specific notes it was applied.

 The next chapter in Rutland's narrative of payment comes after Texas American
Bank failed in July 1989. At some point, General Financial Services (GFS) purchased Regency's
interim construction loan on the Brown house, also acquiring the rights of a secured party to the
Brown note receivable for $104,025. Because Regency had defaulted on the interim construction
note, GFS foreclosed on the Brown note receivable in 1993. The affidavit of Micki Healy,
account officer for GFS, stated that the Brown note receivable was accepted as payment in full
for Regency's promissory note dated November 17, 1987 made payable to Texas American Bank
in the original principal amount of $87,732.96. (6) After foreclosing on the Brown note receivable,
GFS accepted from the Browns less than $90,000 in cash as payment in full on the $104,025 real
estate lien note. It is this transaction that so upset Rutland, who testified that the Brown note
receivable should have been sufficient to pay off both the interim construction loan of
approximately $88,000 and the additional $10,000 note. It is GFS's compromise of the Brown
note receivable that formed the basis for the court's ruling that a predecessor of Cadle had failed
to comply with the commercially reasonable requirements of section 9.504 of the Code, a
conclusion that we will later address.

 We find that Rutland's testimony falls far short of establishing that the promissory
note paid in full by compromise of the Brown note receivable is in fact the same note purchased
by Cadle. The fact that the two notes have approximately the same original principal balance is
not sufficient. Cadle introduced evidence that Regency executed a note payable to the bank on
October 13, 1987, maturing April 11, 1988, in the original principal sum of $88,977.60; this note
was secured by a second lien on 713 Chatham, not the Browns' property at 410 Northcliffe Drive. 
The $88,873.26 note held by Cadle was executed more than a month before the renewal of the
construction loan for the Browns' house. Cadle established that the note it held could be traced
back to an $88,997.60 note executed on October 13, 1987. Rutland testified that an interim
construction note Regency renewed on November 17, 1987, in an unspecified amount
approximating $88,000, was paid by GFS's foreclosure of the Brown note receivable in 1993. 
Rutland assumed, and persuaded the court to assume, that the GFS note paid in 1993 was the same
note held by Cadle. This evidence is insufficient to prove payment. 

 Here Rutland's presumption is defeated by the three notes introduced by Cadle: 
the first executed on October 13, 1987 in the original principal sum of $88,977.60 and secured
by a lien on 713 Chatham; the second, a renewal of the first, executed April 11, 1988 in the same
principal amount, with the same loan number and the same security; and the third a renewal note
executed October 11, 1988, in the principal sum of $88,873.26 with the same loan number but
a slightly reduced principal that was secured by contract rights of all sales of contract homes. 
This third renewal note, which matured April 10, 1989, is the note Cadle sued upon; it does not
mention anywhere that it is secured by the Brown note receivable. The GFS affidavit strongly
suggests that a different note, originating a month earlier with approximately the same principal
balance, was paid by foreclosure of the Brown note receivable. Rutland never produced the
renewal note executed on November 17, 1987; he never produced the security agreement that
identified the indebtedness secured by the Brown note receivable; he could not establish the
original principal balance, saying only that it was around $88,000 ($82,750 plus accrued interest). 
Apart from Rutland's undocumented and vague recollections, nothing supports the assumption that
Cadle's $88,873.26 note is the note that was paid by foreclosure of the Brown note receivable in
1993. Although Rutland's testimony standing alone is some evidence, having fully reviewed the
record, we hold that the evidence supporting the trial court's finding that the $88,873.26 note was
paid in full or discharged by compromise is so weak as to be clearly wrong and manifestly unjust. (7)

 We hold that there is even less evidence to support the trial court's finding that the
$10,000 note held by Cadle was paid in full or compromised. Rutland testified that the Brown
note receivable that was intended to secure both the Brown interim construction loan and the
$10,000 note was compromised in an amount that only satisfied the interim construction loan. 
Rutland complains that the $10,000 note should also have been paid, but was not. However, there
is no testimony that GFS ever held the $10,000 note, and therefore, GFS could not have applied
proceeds from the Brown note receivable to offset the $10,000 indebtedness. (8) Rutland never
testified directly that the $10,000 note was paid. The suggestion that the Browns' monthly
mortgage payments were deposited in an account and swept out to pay Regency's general
indebtedness, without more, does not establish payment of any certain note in any certain amount. 

 Rutland's testimony regarding credits applied to the $25,062.19 note is also
inadequate to meet his burden of proving the affirmative defense of payment. Rutland described
a circumstance where the bank foreclosed on certain lots in the Oak Hills subdivision and arranged
with Regency to build homes on the lots and sell them for the bank. According to the
arrangement described, eighty percent of the profit that Regency would normally receive as the
developer would be applied to its general indebtedness to the bank. Rutland testified that there
were fifteen or more houses built under this arrangement, but he introduced closing statements
from only three such sales. Rutland testified that the profits from these sales, which were all
subsequent to the execution date of the $25,062.19 note, must have been applied to this
indebtedness. However, there is no evidence that the proceeds from these three home sales were
credited solely to the $25,062.19 note; there is no evidence of the profit Regency received from
the sale of houses other than these three. There is evidence that the arrangement with Texas
American Bank required Regency to obtain interim financing from the bank on each home built
in the Oak Hills subdivision. This further obscures which indebtedness the profits from these Oak
Hill sales might have offset. Although Rutland's testimony, plus the three closing statements,
proves that the bank received some profits from Regency to apply to some of its indebtedness,
there is no proof that profits in an amount sufficient to pay the entire $25,062.19 note plus interest
were credited to that indebtedness. Rutland has failed to meet his burden of proving payment, and
the evidence standing alone is so weak as to be clearly wrong and manifestly unjust.

 Having found the evidence factually insufficient to support the trial court's
conclusion that Cadle's three notes were paid or compromised in full, we hold that the take-nothing judgment cannot be supported on this ground. We sustain the relevant portions of issues
two, three, four, five, six, and nine. Unless the trial court's take-nothing judgment can be
sustained on a ground other than the affirmative defense of payment, it must be reversed.


II. Certain Balance Due

 In addition to establishing that the principal on the notes remained unpaid, Cadle
must establish a certain balance was owing on each note. See Bailey, Vaught, Robertson & Co.
v. Remington, Inv., Inc., 888 S.W.2d 860, 866 (Tex. App.--Dallas 1994, no writ). Rutland
asserted at trial, and asserts on appeal, that Cadle could not prove this element of its case because
it could not establish the prime rate of the defunct Texas American Bank. The trial court
apparently agreed and concluded that Cadle did not prove a certain balance was due and owing
on each note. We hold that under applicable Texas law, a variable rate of interest, even if indexed
to a defunct bank's prime rate, does not prevent the holder of such a note from establishing that
a certain balance is due. (9) See id. In this circumstance, "the trier of fact should apply a
'reasonable' rate of interest, considering the facts of each case." Remington, 888 S.W.2d at 866
(emphasis added).

 We understand the trial court's struggle in handling a note with a variable rate of
interest that is tied to a defunct bank's prime interest rate. In Amberboy v. Societe de Banque
Privee, the supreme court, answering a certified question from the United States Court of Appeals
for the Fifth Circuit, held that a note with a variable rate of interest determinable only by
reference to a bank's published prime rate is a negotiable instrument under the Texas Business &
Commerce Code (the Code). See 831 S.W.2d 793, 797 (Tex. 1992) (interpreting when a writing
is a negotiable instrument under former section 3.106 of the Business & Commerce Code). 
Although the comment to former section 3.106 of the Code stated that an instrument was
negotiable only if the sum certain to be paid was capable of computation "from the instrument
itself without reference to any outside source," the supreme court overruled this "four corners"
rule of negotiability. Id. at 794 (quoting comment 1 to former section 3.106 of the Business &
Commerce Code). The court held that the Amberboy ruling promoted the Code's fundamental
purpose to "simplify, clarify and modernize the law governing commercial transactions." Id.
(quoting former section 1.102(b)(1) of the Business & Commerce Code). In so doing the court
noted that when the Code was adopted, variable interest rates were unknown; since the 1980s,
they have come to dominate modern commercial practices, and a construction of the Code that
recognizes that commercial certainty can be accomplished by reference to some authority outside
the writing itself "serves the purpose of the law of negotiable instruments, which is to make the
instrument the functional equivalent of money." Id. at 796, 794-96. 

 The Amberboy court limited its holding to notes with a variable interest rate that
"is readily ascertainable by reference to a bank's published prime rate." Id. at 797 (emphasis
added). Rutland argues that Amberboy does not control this dispute because the interest rate of
a failed bank is not published or ascertainable. We agree. However, the rationale of Amberboy,
coupled with a revision to the Code concerning interest and the directive of a subsequent appellate
court decision, compel us to hold that a variable rate of interest indexed to a failed bank's prime
rate will not defeat a note holder's ability to prove a certain balance is due and owing. 

 After Amberboy was decided, the legislature codified its rationale by adopting the
following Code section addressing the calculation of interest:


Interest may be stated in an instrument as a fixed or variable amount of money or
it may be expressed as a fixed or variable rate or rates. The amount or rate of
interest may be stated or described in the instrument in any manner and may
require reference to information not contained in the instrument. If an instrument
provides for interest, but the amount of interest payable cannot be ascertained from
the description, interest is payable at the judgment rate in effect at the place of
payment of the instrument and at the time interest first accrues . . . . 



Act of June 16, 1995, 74th Leg., R.S., ch. 921, § 1, 1995 Tex. Gen. Laws 4582, 4586-87 (Tex.
Bus. & Com. Code Ann. § 3.112(b), since amended). Section 3.112(b) provides that if the
amount of interest called for in the instrument is not ascertainable, interest is payable at the
effective judgment rate. See Tex. Bus. & Com. Code Ann. § 3.112(b). But see Wooldridge, 968
S.W.2d at 565. According to the comments, the "fixed amount" requirement for a negotiable
instrument set forth in section 3.104(a) of the Code applies only to principal; therefore, "if an
instrument calls for interest, the amount of interest will always be determinable." Tex. Bus. &
Com. Code Ann. § 3.112 UCC cmt. 1 (West Supp. 2000) (emphasis added). 

 The rule in Texas is that courts should give a reasonable construction to the interest
provisions in a promissory note. See Petroscience Corp. v. Diamond Geophysical, Inc., 684
S.W.2d 668, 669 (Tex. 1984); Remington, 888 S.W.2d at 866. In keeping with this rule, the
court in Remington held that the holder of a variable interest rate note, originally payable to a
bank that has subsequently failed, is entitled to a "reasonable" rate of interest in lieu of the prime
rate of the defunct bank. See Remington, 888 S.W.2d at 866. The court reasoned that where the
rate of interest is a term that is essential to a determination of the rights and duties of the parties,
the trial court should imply a contract term to effectuate the intent of the parties. See id; FDIC
v. Cage, 810 F. Supp. 745, 747 (S.D. Miss. 1993). Here, the parties to the note agreed that
interest would be payable on the note. It would be unreasonable to relieve Rutland of his
obligation to pay interest because the parties failed to specify the interest rate to be applied upon
the failure of the Bank. See Cage, 810 F. Supp. at 747. The court erred in failing to imply a
reasonable rate of interest to determine the rights and duties of the parties.

 By presenting the original notes, properly endorsed to Cadle and signed by Rutland,
Cadle presented a prima facie case entitling it to collect the principal balance reflected on the
notes. See Naylor, 430 S.W.2d at 731. The trial court did not allow Cadle to present evidence
of a reasonable rate of interest, such as Wall Street prime, in lieu of the defunct bank's prime
rate. (10) The trial court then concluded that Cadle had failed to prove that a certain balance was due
in order to collect on the three notes. The trial court's finding that Cadle failed to establish a
certain balance due could only be linked to Cadle's failure to establish the proper rate of interest
owing on the three notes. Because it was incumbent on the trial court to provide a reasonable rate
of interest, the court erred in concluding that Cadle could not prove a certain balance was due. 
We hold that such a conclusion is erroneous as a matter of law. (11) See Remington, 888 S.W.2d
at 865; Tex. Bus. & Com. Code Ann. § 3.112(b) UCC cmt. 1 (interest is always determinable). 
We sustain appellant's ninth point of error challenging the conclusion of law that Cadle failed to
prove a certain balance due and the conclusion that the notes are not negotiable instruments. 
Unless the trial court's take-nothing judgment is supported on a ground unrelated to Cadle's
failure to prove a certain balance due, the judgment must be reversed.


III. Commercially Reasonable Disposition of Collateral

 Another stated ground for the trial court's take-nothing judgment was the failure
of Cadle, or its predecessors in interest, to give notice and to dispose of collateral securing the
notes in a commercially reasonable manner as required by section 9.504 of the Code. (12) In its
original petition, Cadle alleged that it had foreclosed on collateral and was suing for deficiencies. 
During trial, Cadle sought to amend its pleading to state that there were no valid liens securing
the three notes and there had been no foreclosures. Defendants did not object to the late trial
amendment, and it was filed after the trial concluded. At no time during the trial did Cadle refer
to any collateral or attempt to prove up a deficiency. Lorna Vugrinovich, an account officer for
Cadle, testified that given the price paid for the loan package, Cadle expected to receive collateral
securing the notes but there was none. Vugrinovich testified that there were no liens securing any
of the notes and there had been no foreclosures or repossessions. She testified that Cadle was
suing for the balance due at the time the notes were purchased and not for any deficiency. At this
point, Cadle offered its trial amendment, deleting the reference to foreclosures and deficiencies. 

 Section 9.504 is a provision that gives the creditor an election of remedies. If the
creditor forecloses on collateral, it may accept the collateral as payment in full for the
indebtedness, but it must account to the debtor for any surplus. See Tex. Bus. & Com. Code
Ann. § 9.504(b). However, if the collateral is insufficient and the creditor complies with the
notice and "commercially reasonable" mandates of section 9.504, the creditor is entitled to the
additional remedy of seeking a deficiency judgment against the debtor. See id. If a creditor fails
to comply with the commercially reasonable standards and notice provisions of section 9.504, the
creditor loses the opportunity to seek a deficiency judgment. See id.

 Rutland testified that Regency's note receivable from Jack and Donna Brown in the
amount of $104,205 "wrapped" two of Regency's notes payable to Texas American Bank, one
in the approximate amount of $88,000, representing a renewal note for the interim construction
financing on the Browns' house, and another in the exact amount of $10,000, representing interest
Regency owed on other indebtedness to the bank. (13) There was evidence that the Brown note
receivable was later acquired by GFS as security when it purchased Regency's interim
construction note in a loan sale agreement in 1993. The trial court apparently concluded that GFS
did not act in a commercially reasonable manner or give notice when it foreclosed on the Brown
note receivable and accepted approximately $90,000 as payment in full from the Browns. This
sum was sufficient to satisfy the $88,000 note, plus interest, that GFS had acquired. Rutland
alleged that this commercially unreasonable "compromise" deprived Rutland of the additional
value from the Brown note receivable that might have been applied to the $10,000 indebtedness
that it also secured. To establish an impairment of collateral under section 9.504, Rutland had
to convincingly link the note held by GFS with the note sued upon by Cadle. Rutland failed to
do this. As we held earlier, Rutland did not meet its burden of proving that the $88,000 note
purchased by GFS was the same note sued upon by Cadle. Therefore, GFS's compromise of the
Brown note receivable, whether or not it was commercially reasonable, (14) could not have affected
Cadle's ability to collect the $88,873.26 note it had acquired. (15) 

 Most importantly, failure to comply with section 9.504 of the Code results in the
inability to seek a deficiency judgment. Section 9.504 becomes irrelevant if this is not a suit for
a deficiency. Cadle testified that it received no security for the three notes, did not foreclose on
any collateral, and was not suing for any deficiencies. It amended its pleadings, without
objection, to conform with these allegations. Under these circumstances, we hold that the trial
court's take-nothing judgment cannot rest on any failure to comply with section 9.504 of the
Code. 

 We overrule Cadle's legal insufficiency points of error because Rutland's testimony
constituted some evidence that payment was made on the notes in question. However, we hold
that the evidence is factually insufficient to support the conclusion that the defendants established
the affirmative defense of payment. Furthermore, we hold that the trial court erred in concluding
that Cadle could not establish a certain balance due. Finally, we hold that section 9.504 of the
Code does not affect Cadle's ability to collect on these unsecured notes and that the trial court
erred in concluding otherwise. Therefore, we hold that there is no legal basis supported by the
evidence for the trial court's take-nothing judgment.


THE GUARANTY

 Cadle also challenges the trial court's conclusion of law that Cadle failed to prove
that it owned Rutland's personal guaranty of Regency's indebtedness. The trial court's conclusion
of law is not binding on this court, and we will independently evaluate the challenged conclusion. 
See Westech, 835 S.W.2d at 196. Conclusions may be reversed if they are erroneous as a matter
of law. See id. Incorrect conclusions of law will not require reversal, however, if the controlling
findings of fact will support a correct legal theory. See id. After reviewing the record, we
determine that the trial court's conclusion that Cadle failed to prove that it owned the guaranty is
erroneous as a matter of law and that under the controlling facts no other legal theory supports
the trial court's conclusion that Rutland is not indebted to Cadle if Cadle otherwise establishes all
the elements necessary to collect on the three notes.

 Even according deference to the trial court's application of law to the facts, we are
persuaded that the trial court failed to apply the law correctly to these facts. See Walker v.
Packer, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). Cadle possessed the original
guaranty and introduced it into evidence without objection. Rutland confirmed that he executed
the guaranty in favor of the bank on March 4, 1988 and that it contained his signature. When
Cadle purchased the three notes from Bank One, the loan sale agreement also conveyed all
collateral documents, defined as follows:


"Collateral Documents" means all of the deeds of trust, mortgages, mechanic's lien
contracts, security agreements, personal guaranties, corporate guaranties, pledges,
collateral assignments, or other documents which specifically secure the
performance or payment of any and all notes evidencing the Loans . . . included
in the Loan Package . . . , and inuring to the benefit of the holder of the notes.



(Emphasis added.) According to the guaranty, Rutland guarantees payment of all Regency's
existing or future indebtedness to Bank or its assignees: 


If any customer's Obligations should be assigned by Bank, this guaranty will inure
to the benefit of Bank's assignee to the extent of such assignment, except that Bank
may first have recourse against such guaranty to the extent necessary to discharge
any Obligations still owing to Bank by Customer.



 Rutland relies on Ashcraft v. Lookadoo to argue that Cadle failed to prove
ownership because it did not establish that Bank One owned a valid guaranty at the time it
conveyed the notes to Cadle. See 952 S.W.2d 907, 912 (Tex. App.--Dallas 1997), pet. denied per
curiam, 997 S.W.2d 562 (Tex. 1998). In Ashcraft, the appellate court rejected the creditor's
proposition that assignment of a note automatically assigns an underlying guaranty. See id. The
court refused to imply a transfer of the guaranty and examined the facts to see if the assignee had
established ownership. See id. at 913. The guaranty was not in the asset file that conveyed the
note, and the assignee did not possess the guaranty, could not produce the original, or prove that
the defendant had ever signed the original. See id. at 912-13. The copy of the guaranty was not
specific to the note in question, and the assignee produced no evidence that the transferor of the
note ever owned a valid guaranty capable of being assigned. See id. at 911-13. The appellate
court found that those facts supported the trial court's finding that assignee failed to prove that he
was the owner of the guaranty. See id. at 913-14.

 Those were not the facts presented to the trial court below. Cadle possessed and
presented to the court the original guaranty, which Rutland acknowledged having executed. The
language of the guaranty specifically stated that it guaranteed all of Regency's existing or future
indebtedness to the bank and was intended to benefit any assignee of the original bank. Finally,
the loan sale agreement specifically conveyed to Cadle all collateral documents, which included
personal guaranties. It was not necessary to imply a transfer of the guaranty on this evidence.

 The facts of this case more closely resemble those of Boyd v. Diversified Financial
Systems in which the appellate court affirmed the trial court's conclusion that the assignee owned
the guaranty. See 1 S.W.3d 888, 890 (Tex. App.--Dallas 1999, no pet.). In reaching this result,
the Dallas court distinguished its earlier decision in Ashcraft by highlighting the different factual
circumstances. See id. at 893. In Boyd the guaranty was in the FDIC's file and was transferred
to the plaintiff who, like Cadle, presented the original guaranty at trial. See id. In Boyd, the loan
sale agreement conveyed all rights of the FDIC under any collateral documents. See id. at 892-93. Similarly, the loan sale agreement at issue here conveyed to Cadle all collateral documents,
including guaranties. The Boyd court held that the facts presented were sufficient to establish the
assignee's ownership of a guaranty. See id. at 893. Cadle's proof is even stronger, in that
Rutland acknowledged executing the guaranty and the guaranty specifically expressed an intent
to benefit assignees of the original bank. 

 The trial court below did not have the benefit of the more recent Boyd opinion. 
To the extent the trial court relied on Ashcraft to conclude that Cadle failed to prove ownership
of Rutland's personal guaranty, we hold that it misapplied the law to the facts of this case. 
Applying the law to the controlling facts, we hold that Cadle proved that the guaranty was
transferred by the loan sale agreement and covered the three notes in question. We sustain the
first issue. 


CONCLUSION

 We hold that the evidence supporting the trial court's finding that the three notes
were paid or compromised in full is so weak as to be clearly wrong and manifestly unjust. We
further hold that Cadle is not precluded from proving a certain balance due because these notes
contain a variable interest rate indexed to the prime rate of a defunct bank, and the trial court's
conclusion to the contrary is erroneous as a matter of law. The trial court is required to provide
a reasonable rate of interest to effectuate the intent of the parties. Additionally, we hold that the
trial court erred as a matter of law in concluding that these notes were not negotiable instruments. 
We hold that the trial court erred as a matter of law in concluding that section 9.504 precludes
Cadle from collecting on these notes. Finally, we hold that Cadle proved ownership of Rutland's
guaranty. The judgment of the district court is reversed, and this cause is remanded for a new
trial.



 


 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel; Justice Yeakel not participating

Reversed and Remanded

Filed: June 15, 2000

Publish
1. We will refer to appellees collectively as Rutland unless the narrative requires mention of
Regency.
2. The principal of the $88,977.60 note had been reduced slightly to $88,873.26 by the time
Cadle sued to collect on it.
3. Cadle also complains that Rutland failed to state distinctly the nature of each payment as
required by Rule 95 of the Texas Rules of Civil Procedure and should not be allowed to prove
payment. See Tex. R. Civ. P. 95. Cadle did not raise this complaint in the trial court and
therefore has not preserved it for appeal. See Tex. R. App. P. 33.1.
4. Rutland never established the exact amount of this note. He did not dispute or affirm the
$87,732.96 principal sum mentioned in the affidavit of Micki Healy that we later discuss.
5. Ray Severn, the bank's president at the time, testified that all loans were cross-collateralized, and in that situation, "you take the largest, weakest loan, whatever you consider
it to be, and that's just a judgment, and that's where you apply it." He testified that classified,
or nonaccrual, notes would be paid first. This testimony does not help Rutland meet his burden
of proving payment because Severn failed to specify which, if any, of the notes in question were
classified notes and failed to identify notes to which payments were applied, how many payments
were made, how much credit applied, and by how much these payments reduced the notes.
6. Healy's affidavit is the only evidence of the original principal amount of the interim
construction loan for the Brown home that was renewed by Regency on November 17, 1987. 
Rutland did not affirm or dispute this amount.
7. There is also no evidence to support the trial court's finding that Cadle's $88,873.26 note
was "renewed and extended" by the Brown note receivable. Indeed, Rutland testified that the
Brown note receivable was a wrap note intended as collateral to secure payment of the interim
construction loan. We sustain Cadle's sixth point of error.
8. Under section 9.504(b) of the Code, GFS would have to account to the debtor for any
surplus. See Tex. Bus. & Com. Code Ann. § 9.504(b).
9. We note that Texas American Bank failed after these notes matured. From our review of
the record, the notes provide for post-maturity interest at the "Highest Lawful Rate" as defined
in the notes. None of the parties or the trial court relied on this interest rate, but we would invite
the parties to consider on remand whether this obviates the need to supply a reasonable rate of
interest in lieu of the defunct bank's prime rate.
10. If properly admitted, evidence of a reasonable rate of interest should be allowed. However,
even if evidence of a reasonable rate is not proffered, interest is always determinable. See Tex.
Bus. & Com. Code Ann. § 3.112(b) UCC cmt. 1.
11. The three notes in question matured in April 1989, before the bank failed in July 1989. 
Presumably, the uncertainty about the failed bank's prime rate will affect only the post-maturity
interest, which must be calculated as set forth in the notes.
12. The following are the portions of section 9.504 pertinent to this discussion:


 (b) If the security interest secures an indebtedness, the secured party must
account to the debtor for any surplus, and, unless otherwise agreed, the debtor is
liable for any deficiency. . . .


 (c) Disposition of the collateral may be by public or private proceedings and
may be made by way of one or more contracts. Sale or other disposition may be
as a unit or in parcels and at any time and place and on any terms but every aspect
of the disposition including the methods, manner, time, place and terms must be
commercially reasonable.



Tex. Bus. & Com. Code Ann. § 9.504(b) & (c). 
13. It is undisputed that the $25,062.19 note held by Cadle was never secured by the Brown
note receivable. Therefore, Rutland's claims regarding the commercial reasonableness of GFS's
compromise of the Brown note receivable do not relate to the $25,062.19 note.
14. Because of the time value of money, notes paid in full before maturity are regularly
discounted. Rutland offered no evidence that the present value in cash of the Brown note
receivable at the time it was paid off exceeded the discounted value accepted by GFS. Without
such testimony, there is no evidence that the GFS's compromise of the Brown note receivable was
not commercially reasonable.
15. GFS never held the $10,000 note also secured by the Brown note receivable and so could
not have applied any additional proceeds to that indebtedness. Of course, the $25,062.19
indebtedness was not secured by the Brown note receivable.



s complaint in the trial court and
therefore has not preserved it for appeal. See Tex. R. App. P. 33.1.
4. Rutland never established the exact amount of this note. He did not dispute or affirm the
$87,732.96 principal sum mentioned in the affidavit of Micki Healy that we later discuss.
5. Ray Severn, the bank's president at the time, testified that all loans were cross-collateralized, and in that situation, "you take the largest, weakest loan, whatever you consider
it to be, and that's just a judgment, and that's where you apply it." He testified that classified,
or nonaccrual, notes would be paid first. This testimony does not help Rutland meet his burden
of proving payment because Severn failed to specify which, if any, of the notes in question were
classified notes and failed to identify notes to which payments were applied, how many payments
were made, how much credit applied, and by how much these payments reduced the notes.
6. Healy's affidavit is the only evidence of the original principal amount of the interim
construction loan for the Brown home that was renewed by Regency on November 17, 1987. 
Rutland did not affirm or dispute this amount.
7. There is also no evidence to support the trial court's finding that Cadle's $88,873.26 note
was "renewed and extended" by the Brown note receivable. Indeed, Rutland testified that the
Brown note receivable was a wrap note intended as collateral to secure payment of the interim
construction loan. We sustain Cadle's sixth point of error.
8. Under section 9.504(b) of the Code, GFS would have to account to the debtor for any
surplus. See Tex. Bus. & Com. Code Ann. § 9.504(b).
9. We note that Texas American Bank failed after these notes matured. From our review of
the record, the notes provide for post-maturity interest at the "Highest Lawful Rate" as defined
in the notes. None of the parties or the trial court relied on this interest rate, but we would invite
the parties to consider on remand whether this obviates the need to supply a reasonable rate of
interest in lieu of the defunct bank's prime rate.
10. If properly admitted, evidence of a reasonable rate of interest should be allowed. However,
even if evidence of a reasonable rate is not proffered, interest is always determinable. See Tex.
Bus. & Com. Code Ann. § 3.112(b) UCC cmt. 1.
11. The three notes in question matured in April 1989, before the bank failed in July 1989. 
Presumably, the uncertainty about the failed bank's prime rate will affect only the post-maturity
interest, which must be calculated as set forth in the notes.
12. The following are the portions of section 9.504 pertinent to this discussion:


 (b) If the security interest secures an indebtedness, the secured party must
account to the debtor for any surplus, and, unless otherwise agreed, the debtor is
liable for any deficiency. . . .


 (c) Disposition of the collateral may be by public or private proceedings and
may be made by way of one or more contracts. Sale or other disposition may be
as a unit or in parcels and at any time and place and on any terms but every aspect
of the disposition including the methods, manner, time, place and terms must be
commercially reasonable.



Tex. Bus. & Com. Code Ann. § 9.504(b) & (c). 
13. It is undisputed that the $25,062.19 note held by Cadle was never secured by the Brown
note receivable. Therefore,